263 N.J. Super. 497 (1993)
623 A.2d 285
CHARLES C. WARD AND MARY B. WARD, PLAINTIFFS-RESPONDENTS,
v.
JOHANAN ZELIKOVSKY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted January 5, 1993.
Decided April 13, 1993.
*499 Before Judges ANTELL, DREIER and SKILLMAN.
Cooper, Perskie, April, Niedelman, Wagenheim & Levenson, attorneys for appellant (Thomas M. Murtha, on the brief).
Weiner, Catlett & Shanker, attorneys for respondents (Arthur L. Shanker, of counsel and on the brief).
The opinion of the court was delivered by ANTELL, P.J.A.D.
*500 Defendant appeals from defamation judgments of $25,002, together with combined pre-judgment interest from August 10, 1989, through January 10, 1992, in the combined amount of $9,785.78, entered in favor of each of the plaintiffs, who are husband and wife. The complaint herein alleges two separate causes of action. The first involved an alleged assault and battery committed by defendant on plaintiff Mary Ward on June 18, 1988. The second involved defamatory statements about both plaintiffs made by defendant at a public meeting on July 30, 1989. Although the jury found that the assault and battery had been proven, it awarded neither compensatory nor punitive damages on that finding. The issue before us is whether plaintiffs' proofs support the finding of slander. The material facts follow.
Plaintiffs and defendant owned separate condominium units at the Ocean Club in Atlantic City. On July 30, 1989, they attended a Board meeting of the condominium association where approximately 100 residents were present. Mr. Ward briefly addressed the Board, and when Mrs. Ward got up to add something, according to her, defendant leaped to his feet and screamed "Don't listen to those people. They don't like Jews. She's a bitch. I remember her. She's a bitch." Mr. Ward testified that defendant shouted, "I know her. She's a bitch. These people, they hate Jews. These people hate Jews." Defendant's statements were wholly unrelated to the remarks plaintiffs had addressed to the Board, which had only to do with the business of the condominium and in no way implicated defendant.
In response to the question as to how plaintiff's verbal assault made her feel, Mrs. Ward gave the following responses:
Well, frankly, I mean my  I have never been insulted in public or hardly ever insulted, I guess that's fortunate, in my life by people that I didn't know very well; and my legs started to shake; and I sat down; and I was going to cry; and then I thought, "I'm not going to do this in front of people" because everybody turned around and was looking at us and  I mean I can remember *501 who was sitting in front of us and where  and I was embarrassed  terribly embarrassed.
When asked whether her feeling of embarrassment went away after the meeting, she answered "No, it didn't go away because people came up after the meeting and commented on it. In the elevator on up to our place, people commented on it; and I was very embarrassed because how do you stand up and say, `That's not true. That's not true,' you know?" She asserted that defendant's accusation was "[a]bsolutely not" true.
Ocean Club is a residential complex consisting of 725 condominium units. According to Mrs. Ward, the club houses "a large Jewish population," a judgment she reached based upon her experience as head of the "Sunshine Committee." The function of the Sunshine Committee is to send appropriate greeting cards, condolences, congratulatory messages, and the like, to members of the condominium association. As committee head, Mrs. Ward was in a position to note the celebration of Jewish holidays and the number of bar mitzvah cards being sent out.
At the time of the incident, Mrs. Ward was working as a realtor in Margate where she had a large number of Jewish associates. She always feared that they would confront her over this incident in one way or another.
Mr. Ward described his response to defendant's statement in the following way:
On the one hand powerless to stop this man and there were two parts of this thing: One was calling my wife a bitch. The second part was saying repeatedly that we hate Jews in front of a group of people that it would be impossible to defend myself if, indeed, I had to defend myself. But I felt upset, frustrated, embarrassed, all those emotions. My mind was racing. I mean I don't understand how anybody could attack someone like that particularly when I wasn't even talking to the gentleman.
At that time, Mr. Ward was negotiating for the purchase of a real estate company located at the Ocean Club and in Margate, but these prospects were never consummated partly because of Mr. Ward's "rational concern" that "just the rumor that you, quote, `Don't like Jews,' is probably enough to not do business in Margate in my opinion." Mr. Ward also stated that it was *502 absolutely untrue that he disliked Jews. In response to the question, "How do you prove it?" he answered:
That's what I've had a lot of conversations in the last few years about, and I don't know how you prove a negative, or how you prove you're not something. I don't drink either, but I'd have trouble proving it to you. You know, it's tough to prove those things.
Defendant did not deny making the statement. The only fact he offered in justification thereof was that he had been told by Sheila Polin, another resident at Ocean Club, that she had once heard Mr. Ward make an anti-semitic remark. Defendant, however, could not remember the exact nature of the remark. Sheila Polin, whom defendant called as a witness, confirmed that she had once heard Mr. Ward make a comment about Jews that she considered derogatory. She also testified that she related this fact to defendant. However, she, like defendant, did not remember what the comment was.
Before submitting the case to the jury, the court concluded that the offensive statements were not slanderous per se and that special damages would have to be found to establish the cause of action. The court instructed the jury accordingly.
By its verdict, the jury found that defendant did in fact slander Mary Ward, but that she had sustained no special damages. Although the jury verdict form reports that she had sustained general damages, they made no compensatory award. However, the jury allowed Mrs. Ward $25,000 in punitive damages. The jury also found that defendant had slandered Mr. Ward. As to him, it concluded that he had sustained special and general damages, but that the amount of such damages was zero. Mr. Ward, too, was awarded punitive damages in the amount of $25,000.
Upon receiving the jury's verdict, the court reminded the jurors of its instruction that punitive damages could not be awarded in the absence of special damages. It then recharged the jury with respect to damages, particularly pointing out the jury's option to find nominal special damages in order to support the punitive damage verdicts. After deliberating further, the jury returned with a second verdict, this time finding *503 that Mrs. Ward had sustained special and general damages of $1 and again awarding punitive damages in the amount of $25,000. An identical award was entered in favor of Mr. Ward.
The trial court decided that plaintiffs had proved special damages based upon their testimony that, following the incident at the condominium meeting, they experienced a marked "coolness" on the part of the other residents in the condominium and that they were not invited to participate in condominium activities in a way that they had before. Plaintiffs contended that as a result they suffered a substantial material harm, though not necessarily capable of quantification, in the loss of use, enjoyment and security of their home and ability to participate in the Ocean Club activities. In Arturi v. Tiebie, 73 N.J. Super. 217, 222, 179 A.2d 539 (App.Div. 1962), the following was stated as to the proof of special damages needed to make out a case of slander:
The special harm a plaintiff must prove is harm of a material or pecuniary nature. Restatement, Torts, sec. 575, p. 185. There must be proof of a pecuniary loss or loss of some substantial or material advantage. 53 C.J.S. Libel and Slander § 268(b), p. 390.
See also, Hoagburg v. Harrah's Marina Hotel, 585 F. Supp. 1167, 1170 (D.C.N.J. 1984); Prosser and Keeton, The Law of Torts, § 112 at 794 (5th Ed. 1984).
We agree with defendant that plaintiffs' claimed loss did not constitute "harm of a material or pecuniary nature."
... lowered social standing and its purely social consequences are not sufficient. Thus the fact that a slander has caused the person defamed to lose caste in the eyes of his friends and so has deprived him of many pleasant social contacts is not special harm.
[Restatement (Second) of Torts, § 575 comment b at 198 (1977).]
Defendant argues that without proof of special damages the defamation is not redressible. He relies upon Arturi v. Tiebie, supra, 73 N.J. Super. at 222, 179 A.2d 539, where the court stated the following:
Slander is actionable per se, that is, without charge or proof of special damages, when the false statements (1) charge commission of a crime, (2) impute certain loathsome diseases, (3) affect a person in his business, trade, profession or office, or (4) impute unchastity to a woman. Gnapinsky v. Goldyn, supra, [23 N.J.] at p. 250 [128 A.2d 697]. If the defamatory statements are not within any *504 of these four categories, plaintiff must prove that the utterance thereof was the legal cause of some special harm. Restatement of the Law, Torts, sec. 575, p. 185.
The defamatory words spoken by defendant at the condominium meeting cannot, of course, be subsumed under any of the foregoing categories. Plaintiffs argue, however, that although Arturi v. Tiebie claims to have its ancestry in the opinion of our Supreme Court in Gnapinsky v. Goldyn, 23 N.J. 243, 250, 128 A.2d 697 (1957), it is not genuinely reflective of New Jersey law governing this issue at the present time.
The New Jersey source decision on the subject of slander per se appears to be Shaw v. Bender, 90 N.J.L. 147, 100 A. 196 (E. & A. 1917). The rule there stated was that "[w]henever words clearly `sound to the disreputation' of the plaintiff, there is no need of further proof, they are defamatory on their face and actionable per se." Id. at 149, 100 A. 196. The court added that "[s]poken words are defamatory when the imputation cast by them on the plaintiff is on the face of it so injurious that the court will presume, without proof, that plaintiff's reputation has been thereby impaired...." Ibid. As Arturi v. Tiebie correctly stated, our Supreme Court in Gnapinsky v. Goldyn, supra, 23 N.J. at 250, 128 A.2d 697, recognized that slander is actionable per se, that is, without charge or proof of special damages, when the defamatory utterances fall into any one of the four specified classifications. However, Gnapinsky did not restrict the proof of slander per se to those exceptions. What Gnapinsky stated was that there were three categories of false statements "which are generally deemed to be actionable per se," and then noted that Professor Prosser had added a fourth, the imputation of unchastity to a woman. Id. at 250, 179 A.2d 539. As the quoted extract from Arturi v. Tiebie itself shows, that court's determination to limit cases of slander per se to the four classifications was drawn from the Restatement of the Law of Torts. It did not have its genesis in any New Jersey precedent.
Our research has disclosed no later cases in this state that apply the compartmentalized standard articulated by Arturi. *505 Indeed, succeeding opinions set forth the test of defamation per se in broad terms that make allowance for the infinitely varied forms of offense to reputation: "Words that clearly denigrate a person's reputation are defamatory on their face and actionable per se," Printing Mart v. Sharp Electronics, 116 N.J. 739, 765, 563 A.2d 31 (1989); "If a published statement is susceptible of one meaning only, and that meaning is defamatory, the statement is libelous as a matter of law," Romaine v. Kallinger, 109 N.J. 282, 290, 537 A.2d 284 (1988); "A determination of whether certain language is defamatory on its face rests within the power of the trial court [citation omitted]. Only when the court finds the words to be capable of both a defamatory and a nondefamatory meaning does a question of fact arise for the jury to decide." Lawrence v. Bauer Pub. & Print. Ltd., 89 N.J. 451, 459, 446 A.2d 469, cert. denied, 459 U.S. 999, 103 S.Ct. 358, 74 L.Ed.2d 395 (1982); "A false statement is defamatory if it exposes a person to hatred, contempt or ridicule, or subjects him to a loss of good will and confidence of others, or so harms his reputation as to deter others from associating with him," Lutz v. Royal Ins. Co. of America, 245 N.J. Super. 480, 492, 586 A.2d 278 (App.Div. 1991).
In Hall v. Heavey, 195 N.J. Super. 590, 481 A.2d 294 (App. Div. 1984), a slander case, the court defined defamation as "insult to someone's reputation and good name caused by uttering words which tend to hold plaintiff up to contempt, hatred, ridicule, aversion or disgrace." Id. at 594, 481 A.2d 294. The court observed that because of the early reluctance of the courts to accept the action of slander, the rule developed that suit would not lie without proof of special damages. It went on to explain that "exceptions were created to allow the claim if the `words clearly sound to the disreputation of the plaintiff,' making them `defamatory on their face and actionable per se,'" citing Shaw v. Bender, supra. Id. at 594-595, 481 A.2d 294. It did not suggest that slander per se must be limited to the four categories mentioned by Arturi.
Like much in the law of defamation, the requirement of special damages to sustain a charge of slander can be explained only as a matter "of historical accident and survival." Prosser *506 and Keeton, supra, at 772. Described as "arbitrary and illogical," ibid, it does not apply in the case of libel. Id. at 785-86. See also Herrmann v. Newark Morning Ledger, 48 N.J. Super. 420, 443, 138 A.2d 61 (App.Div. 1958). The origins of the rule can be understood from the language of the following text:
The actions for defamation developed according to no particular aim or plan. Originally the common law courts took no jurisdiction, leaving defamatory utterances to be dealt with by the local seigniorial courts. When these began to fall into decay, the ecclesiastical courts stepped in, regarding defamation as a sin, and punishing it with penance. As these courts in turn lost their power, there was in the sixteenth century a slow infiltration of tort actions for slander into the common law courts. For a considerable length of time there were conflicts over jurisdiction between the two sets of tribunals, which led the common law courts to hold that unless "temporal" damage could be proved, defamation was a "spiritual" matter which should be left to the Church. When the common law jurisdiction was once established, an unexpected flood of actions was let loose upon the judges, who seem to have been annoyed and dismayed by it, and so proceeded to hedge the remedy about with rigid restrictions, some of which survive.
[Prosser and Keeton, at 772.]
* * * * * * * *
The reluctance with which the common law courts at first received the action of slander, and their fear of invading the province of ecclesiastical law, led them to hold that the action would not lie without proof of "temporal" damage. From this there developed the rule that slander, in general, is not actionable unless actual damage is proved. To this the courts very early established certain specific exceptions: the imputation of crime, of a loathsome disease, and those affecting the plaintiff in his business, trade, profession, office or calling  which required no proof of damage. The exact origin of these exceptions is in some doubt, but probably it was nothing more unusual than a recognition that by their nature such words were especially likely to cause pecuniary, or "temporal," rather than "spiritual" loss.

[Id. at 788.]
In our view, appellate opinions in this state, both before and after Arturi v. Tiebie, adhere to a plastic standard intended to accommodate the demands of justice in the countless factual congeries as they arise. Their allusions to the four exceptions only serve to illustrate the kinds of defamations that have been recognized in the past as actionable per se. They do not follow the rule that, unless the defamatory statement falls within one *507 of the four categories specified in Arturi, special damages must be shown.
Cases from other jurisdictions involving the question of whether imputations of racial or ethnic bigotry may be slanderous per se are few in number. In City of Brownsville v. Pena, 716 S.W.2d 677 (Tex. App. 1986), a company manager accused plaintiff of having "racist attitudes against Mexicans legally residing in the United States," id. at 679, and the jury awarded compensatory and punitive damages. On appeal, the court concluded without discussion that defendant's words were "so obviously hurtful to the person aggrieved by them that they require no proof of their injurious character to make them actionable," that the accusation of bias was therefore actionable per se and that "the law presumes actual damages." Id. at 682.
In Rybas v. Wapner, 311 Pa.Super. 50, 457 A.2d 108 (1983), during the course of a law suit arising out of a landlord-tenant relationship, the tenant's attorney wrote to the landlord's attorney urging that the landlord make "some attempt to demonstrate that he is not as an [sic] anti-Semitic as he appears to be, and to make some effort at trying to live together as a good neighbor." Id. 457 A.2d at 109. Thereupon, the landlord sued the tenant's attorney in defamation. On appeal, the court affirmed the judgment for defendant. In determining that the words were not capable of defamatory meaning, the court examined the factual context and the nature of the intended audience. It took into account that the letter was intended for a fellow attorney "and was intended for no other audience. The intended publication was therefore extremely limited." Id. at 111. The court also held that the nature of the intended audience was a "`critical factor'" in evaluating the factual context, ibid., and distinguished the case from that presented in O'Donnell v. Philadelphia Record Co., 356 Pa. 307, 51 A.2d 775, cert. denied, 332 U.S. 766, 68 S.Ct. 74, 92 L.Ed. 351 (1947). There, in an editorial statement published by defendant newspaper company, plaintiff was accused of being in "sympathy with most of Hitler's aims  such as destruction of the British Empire, *508 suppression of labor unions and liquidation of the Jews." In that case the court held that the statement was defamatory per se, noting that the publication appeared at a time when the United States was on the brink of war with Nazi Germany, and was republished after the outbreak of hostilities.
In Rambo v. Cohen, 587 N.E.2d 140 (Ind. App. 1992), the superintendent of a correctional institution was accused by plaintiff, a lesser employee of the institution, of calling him, among other things, "anti-Semitic." Summary judgment in favor of defendant was entered on the ground, among others, that the communication was not defamatory. On appeal, following the analysis prescribed in Rybas, supra, the court made its determination of whether the accusation of being "anti-Semitic" was defamatory "in light of all the circumstances surrounding its utterance," id. at 148. Observing that the audience was comprised of only two people,[1] the court could not see how the words spoken by the defendant could have defamed plaintiff. As in the Rybas case, the court also drew the distinction between the facts presented and those considered in O'Donnell v. Philadelphia Record Co.
In Sweeney v. Schenectady Union Pub. Co., 122 F.2d 288 (2d Cir.1941), aff'd. 316 U.S. 642, 62 S.Ct. 1031, 86 L.Ed. 1727 (1942), reh. denied, 316 U.S. 710, 62 S.Ct. 1266, 86 L.Ed. 1776 (1942), plaintiff was a congressman from Ohio who sued defendant newspaper that had accused him of opposing a particular appointment to the federal bench because the nominee was a naturalized Jew born in Hungary. The complaint was dismissed and plaintiff appealed. The Second Circuit Court of Appeals reversed under a New York statute which made libelous per se the publication of
words which tend to expose one to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or to *509 induce an evil opinion of one in the minds of right-thinking persons, and to deprive one of their confidence and friendly intercourse in society.

[Id. at 290.]
It is evident that the foregoing statute expresses the same principles that govern the law of defamation per se in the State of New Jersey. In reversing, the court wrote that although the beliefs attributed to plaintiff by defendant's publication might gain him increased approval and respect in some quarters, nevertheless,
in a country still dedicated to religious and racial freedom decent, liberty-loving people still are present in great numbers and still are greatly offended by the narrow-minded injustice of the bigots who see individuals only en masse and condemn them merely because their ancestors were of a certain race or they themselves are of a certain religion. Those who hate intolerance are prone to regard the person who believes in and practices acts of intolerance with aversion and contempt.

[Ibid.]
In evaluating the context, the court also took into account, as a factor aggravating the consequences of the defamation, the notorious persecution of European Jews which was then being carried out by the German government.[2]
What we distill from the foregoing authorities is that the test of slander per se goes beyond the spoken words. In our view, it requires that recognition be given to all the facts and circumstances which, in combination, give rise to the claim of damage to reputation. Paramount to the inquiry is the statement's in-context capacity for harm. Thus, in making our analysis we look at the statement itself, the nature and dimension of the audience to which it was addressed, as well as the audience's probable sociological orientation, the statement's potential for circulation beyond the original audience, and the opportunity available to the injured parties to neutralize the *510 statement at the time it was made and to remedy the harm thereafter.
In as hurtful a way as he could, without warning and without a shred of proof, defendant maliciously reviled plaintiffs with accusations of racial and ethnic hatred. Energized by the inflammatory epithet "bitch," the charge was angrily made at a public meeting in the presence of approximately 100 people, many of whom plaintiffs did not even know. The charge had no relevance to any of the proceedings taking place at the meeting and was unprovoked by anything plaintiffs had said. It is impossible to gauge the full consequences of defendant's reckless denunciation. As plaintiffs testified, there is no way for them to counter the accusation or to appreciate all the ramifications of its impact upon their lives. Although plaintiffs are unable to quantify the damage they suffered, it is virtually certain that harm was done and that it may well be incalculable. They could only wonder about how many of the people present would repeat, and to whom, defendant's outrageous statement.
According to plaintiffs, the residential population at Ocean Club is largely Jewish and plaintiffs had no workable means of halting the circulation of what defendant had said. They were too stunned to rebut the charge at the time it was made and there was no way for them to contain its toxic effect thereafter. No recourse was open to them other than to retire and lick their wounds. Defendant's imputation of a hateful bias under the circumstances presented was an insult to reputation and good name which held plaintiffs up to contempt, hatred, ridicule, aversion and disgrace as a matter of law.
Contrary to what is argued by the dissent, this accusation of an intellectual virus is no less an assertion of fact than the imputation of a "loathsome disease." Decisions relied on by the dissent deal with the term "racist." But "racist" does not equate with "Jew hater." This was recognized by Kimura v. Superior Court (Vandenberg), 230 Cal. App.3d 1235, 281 Cal. Rptr. 691 review denied and opinion ordered not to be *511 officially published, ibid (Cal. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 937, 117 L.Ed.2d 108 (1992), among others cited by the dissent, when it observed, "the term `racist' has no precise meaning, can imply many different kinds of facts, and is no more than meaningless name-calling...." Id. 281 Cal. Rptr. at 694. There is nothing imprecise or meaningless about "They hate Jews," particularly when used with the epithet "bitch" so as to signify a woman strongly deserving of "contempt and hostility." See, Webster's Unabridged Dictionary (Dorset & Baker, 2d Edition). These words are susceptible of one meaning only, and that meaning is clearly defamatory. They were therefore actionable per se. See Printing Mart v. Sharp Electronics, supra, 116 N.J. at 765, 563 A.2d 31; Romaine v. Kallinger, supra, 109 N.J. at 290, 537 A.2d 284.
Our dissenting colleague argues that there are two meanings to the term "slander per se," one to describe a statement defamatory on its face, and the other to describe a defamation actionable without proof of special harm. We disagree with this analysis. In our view, it has only a single meaning, that is, a statement defamatory on its face. Although it follows from such a determination that the statement is actionable without proof of special damage, that characteristic does not constitute a separate meaning.
In the law of defamation, the terms "per se" and "per quod" simply differentiate between statements defamatory on their face and those defamatory solely in the light of extrinsic facts. Herrmann v. Newark Morning Ledger Co., 48 N.J. Super. at 443, 138 A.2d 61. The terms only serve to describe the form that the defamation takes. The fact that the term "per quod" is used to identify statements whose defamatory character can be understood only by recourse to extrinsic evidence, does not alter the fact that the term "per se" carries only a single meaning, i.e., a statement which is defamatory on its face and therefore actionable without proof of special damages. Contrary to the belief expressed by the dissent, we conclude that it was in this sense only that the term could have been *512 used by the Supreme Court in Gnapinsky v. Goldyn, 23 N.J. at 250, 128 A.2d 697.
We cannot dispute the view expressed by Rodney A. Smolla, cited by the dissent, that the history of defamation law "is a quagmire of archaic, arbitrary, internally inconsistent rules." This troubled development is in part a product of historical events. But it was also contributed to by the conscientious labors of many judges responding to the demands of justice in the individual cases coming before them, according to the morals and the values of the times in which they lived. So in this case, we cannot leave the record now before us without a settled conviction that plaintiffs are entitled to a remedy. In our view, under contemporary standards, the accusation of hating Jews is at least as much of an assault upon reputation as statements that charge commission of a crime, impute a loathsome disease, affect a person in his business, trade, profession or office or impute unchastity to a woman. Professor Smolla himself puts it in the following way:
The four slander per se categories are arbitrary and archaic, reflecting sensibilities that are no longer completely relevant to contemporary values. Nonetheless, because of the crazy quilt of confusion that already surrounds the whole slander and libel per se terminology, courts have tended to follow the four categories mechanically. The retention of the rule concerning unchastity in a woman is particularly outmoded, for example. An allegation that a woman is sexually promiscuous is slander based on sexual stereotypes that probably could not withstand a modern equal protection clause attack. The four categories certainly do not encompass the full range of extremely serious forms of defamation, and they encompass some allegations that many Americans would regard as not serious at all. [Emphasis supplied]
[Rodney A. Smolla, Law of Defamation § 7.05 at 7-7 (1986).]
Defendant also argues that the evidence was insufficient to support the award of punitive damages. In McDonough v. Jorda, 214 N.J. Super. 338, 349, 519 A.2d 874 (1986), certif. denied, 110 N.J. 302, 540 A.2d 1282 (1988), cert. denied, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989), we stated the following:
In assessing exemplary damages, a jury must take into consideration the wealth of the defendants. Leimgruber v. Claridge Assoc's, 73 N.J. [450] at 456 [375 A.2d 652]. This is so because the theory behind punitive damages is to *513 punish for the past event and to prevent future offenses, and the degree of punishment resulting from a judgment must be, to some extent, in proportion to the means of the guilty person. Restatement (Second) of Torts, § 908, comment d (1977).
The only evidence presented of defendant's means consisted of his income tax returns for the years 1988 through 1991. Defendant contends that proof of his income for those years does not tend to prove the extent of his wealth. We disagree. The returns showed income of more than $100,000, of which approximately $70,000 consisted of interest and dividends. From this the jury could fairly estimate the extent of defendant's wealth. In addition, defendant offered no evidence of his liabilities to dispute the picture of his financial circumstances shown by the returns.
It is settled that prejudgment interest may not be allowed on an award of punitive damages. Cappiello v. Ragen Precision Indus., Inc., 192 N.J. Super. 523, 533, 471 A.2d 432 (App.Div. 1984); Zalewski v. Gallagher, 150 N.J. Super. 360, 373, 375 A.2d 1195 (App.Div. 1977); Belinski v. Goodman, 139 N.J. Super. 351, 359-60, 354 A.2d 92 (App.Div. 1976). Accordingly, the award of $9,785.78 in combined prejudgment interest will be deleted from the judgment. In all other respects the judgment is affirmed.
SKILLMAN, J.A.D., dissenting.
The majority concludes that defendant's characterization of plaintiffs as "Jew haters" was defamatory as a matter of law. The majority also concludes that this characterization was a "slander per se," and thus plaintiffs established a cause of action for defamation without the necessity of showing any actual damage to their reputations. I disagree with both of these conclusions and therefore respectfully dissent.

I
A statement is not defamatory simply because it has a tendency to cause damage to another's reputation. To be *514 defamatory, a statement must be a false assertion of fact rather than simply an expression of the speaker's opinion, or if the statement is in the form of an opinion, it must imply the allegation of undisclosed defamatory facts. Kotlikoff v. The Community News, 89 N.J. 62, 68-69, 444 A.2d 1086 (1982); Karnell v. Campbell, 206 N.J. Super. 81, 89, 501 A.2d 1029 (App.Div. 1985). This essential element of a defamatory statement is described in section 566 of the Second Restatement of Torts:
A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.[1]
[Restatement (Second) of Torts § 566 (1977).]
Comment (e) to section 566 indicates that verbal abuse of another person, even if expressed in the form of a statement of fact, may be understood by reasonable listeners not to be an allegation of fact:

Verbal abuse. There are some statements that are in form statements of opinion, or even of fact, which cannot reasonably be understood to be meant literally and seriously and are obviously mere vituperation and abuse. A certain amount of vulgar name-calling is frequently resorted to by angry people without any real intent to make a defamatory assertion, and it is properly understood by reasonable listeners to amount to nothing more. This is true particularly when it is obvious that the speaker has lost his temper and is merely giving vent to insult. Thus when, in the course of an altercation, the defendant loudly and angrily calls the plaintiff a bastard in the presence of others, he is ordinarily not reasonably to be understood as asserting the fact that the plaintiff is of illegitimate birth but only to be abusing him to his face. No action for defamation will lie in this case.
The circumstances under which verbal abuse is uttered affect the determination of how it is reasonably to be understood. Words uttered face to face during an altercation may well be understood merely as abuse or insult, while *515 words written after time for thought or published in a newspaper may be taken to express the defamatory charge and to be intended to be taken seriously.
See also Salek v. Passaic Collegiate School, 255 N.J. Super. 355, 358-59, 605 A.2d 276 (App.Div. 1992) (captions under pictures in high school yearbook containing sexual innuendos directed at a teacher held not to be false statements of fact but rather non-defamatory parody, satire, humor or fantasy.); Arturi v. Tiebie, 73 N.J. Super. 217, 223, 179 A.2d 539 (App.Div. 1962) (characterization of plaintiff as "no good dirty guinea" held not to be defamatory).
Thus, defendant's characterization of Mrs. Ward as a "bitch" was simply personal invective which was not defamatory, even though it may have been offensive to her and may have been understood by those who heard it to express a negative opinion of Mrs. Ward's personality.[2] Therefore, the trial court erred in not granting defendant a directed verdict insofar as plaintiffs' slander claim rested on this characterization.[3]
Defendant's characterization of plaintiffs as "Jew haters" is a more complex statement, which requires more detailed analysis. In form, this characterization is a statement of fact, but the alleged "fact" relates to plaintiffs' states of mind. Therefore, unless plaintiffs had taken actions to express their hatred of Jews, the truth of this characterization could not be either *516 proven or disproven, except perhaps by psychiatric evaluation. Of course, such a characterization could refer either expressly or impliedly to alleged facts beyond simply plaintiffs' states of mind. For example, the characterization could constitute an allegation that plaintiffs have discriminated against Jews in business matters, have never invited Jews into their condominium or have made anti-Semitic comments. Such an allegation would be a statement of fact which could be defamatory if it was injurious to plaintiffs' reputations. See Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 765, 563 A.2d 31 (1989).
However, defendant's characterization of plaintiffs as "Jew haters" also could have been understood by reasonable listeners not to constitute a statement about either plaintiffs' states of mind or their conduct but rather to be a reflection of the state of mind of the defendant, a seventy year old Holocaust survivor. Some members of our society habitually attribute any hostile conduct and any real or imagined slights by others to racial, religious or ethnic bias. Certainly, a statement which is understood by reasonable listeners to reflect the racial or ethnic paranoia of the speaker rather than the views or conduct of the person at whom the statement is directed is not a statement of fact which could cause damage to the target's reputation and thus is not defamatory.
In addition, charges of racism and other forms of ethnic bias have become commonplace in local political campaigns, on college campuses, and in various other arenas of intemperate debate. In such settings, charges of racial or ethnic bigotry are generally understood to be simply personal invective, similar to a characterization of a person as a bitch, which are viewed as non-defamatory expressions of personal opinion. Restatement (Second) of Torts, supra, § 566.
Recognizing that charges of racial or ethnic bigotry are frequently used as personal invective or inflammatory political rhetoric, most courts in recent years have concluded that such *517 charges are non-defamatory unless they imply allegations of undisclosed empirically verifiable facts. Thus, in Kimura v. Superior Court (Vandenberg), 230 Cal. App.3d 1235, 281 Cal. Rptr. 691, review denied and opinion ordered not to be officially published, ibid. (Cal. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 937, 117 L.Ed.2d 108 (1992), a college administrator, who apparently was a Filipino, publicly disseminated a letter to another higher-level college administrator who canceled an event referred to as "Filipino Night," charging that his actions resulted from "bigotry and racism." In concluding that this statement was not defamatory, the court stated:
Putting aside for a moment all constitutional considerations, no communication gives rise to an action for defamation unless it either alleges or implies defamatory facts. (See generally Rest.2d Torts, § 566.) It has therefore long been the law that mere statements of "opinion" are not actionable.
....
[T]he language of the letter, and particularly its use of the epithet "racist," does not have the tone of a reasoned accusation, but rather is more like the emotional rhetoric characteristic of debate in this area. One decision has noted that the term "racist" has no precise meaning, can imply many different kinds of facts, and is no more than meaningless name-calling, not actionable under Illinois state defamation law.
....
Accusations of racism in a college community are more apt to be expressions of anger, resentment, and possibly political differences of opinion, than to be factual accusations intended to be taken literally.
....
Focussing on the language of Kimura's letter here, we believe that the audience to which it was addressed and circulated would not reasonably believe that it implied or was based on undisclosed factual accusations. We reach this conclusion both because of the emotional and angry tone of the letter, which does not imply reasoned debate, and also because its actual accusations are imprecise and difficult if not impossible to verify.

[Id. 281 Cal. Rptr. at 694-95, 698, 700.]
In Koch v. Goldway, 817 F.2d 507, 508 (9th Cir.1987), the court held that the following statement which the defendant directed at a political opponent named "Ilse Koch" was non-defamatory:

*518 There was a well-known Nazi war criminal named Ilse Koch during World War II. Like Hitler, Ilse Koch was never found. Is this the same Ilse Koch? Who knows?
The court said that no one hearing this statement could actually believe that plaintiff was the Nazi war-criminal who was named "Ilse Koch" because she was too young. Thus, the statement had to be viewed as "vituperation" rather than an allegation of fact. Id. at 509. In the course of its opinion, the court observed:
It is perhaps unfortunate that the legal category of opinion, which sounds, and often is, a dignified classification for the pursuit of honest and fair debate, must also be used to describe statements such as the one at issue here, which, in reality, is nothing more than a vicious slur.

[Id. at 510.]
To the same effect, the court in Raible v. Newsweek, Inc., 341 F. Supp. 804, 808-09 (W.D.Pa. 1972), stated:
Americans have been hurling epithets at each other for generations. From charging "Copperhead" during the Civil War, we have come down to "Racist", "Pig", "Fascist", "Red", "Pinko", "Nigger Lover", "Uncle Tom" and such. Certainly such name calling, either expressed or implied, does not always give rise to an action for libel.
In City of Brownsville v. Pena, 716 S.W.2d 677 (Tex. Ct. App. 1986), one of the cases relied upon by the majority, the defamation consisted not only of a statement that plaintiff, a dispatcher for the city bus system, had "racist attitudes against Mexicans legally residing in the United States" but also that he had "threatened to fire [the Mexican bus drivers] as soon as he takes over." Id. at 679. Thus, the statement which the court held to be defamatory was not merely an expression of the defendant's personal opinion but a factual assertion that plaintiff had said he would discharge some of his subordinates based on their national origin.
Similarly, in Sweeney v. Schenectady Union Pub. Co., 122 F.2d 288 (2d Cir.1941), aff'd. by an equally divided court, 316 U.S. 642, 62 S.Ct. 1031, 86 L.Ed. 1727 (1942), another case relied upon by the majority, the alleged defamation consisted not simply of a characterization of someone as anti-Semitic but *519 a factual assertion that plaintiff, a member of Congress, was attempting to block the appointment of a person to the federal bench because he was a foreign-born Jew. Such an allegation of discriminatory conduct is a statement of fact rather than simply an expression of opinion or personal invective.[4]
In Rybas v. Wapner, 311 Pa.Super. 50, 457 A.2d 108, 110 (1983), also discussed in the majority's opinion, the court held that the characterization of a person as "anti-Semitic" in a letter to his attorney was not capable of a defamatory meaning:
[N]ot every embarrassing and annoying publication is a libel. A publication which charges that an individual is actuated by unpleasant or undesirable prejudice may offend his sensitivities, but is not thereby libelous.
We note that to restrict too severely the right to express such opinions, no matter how annoying or disagreeable, would be dangerous curtailment of a First Amendment Right. Individuals should be able to express their views about the prejudices of others without the chilling effect of a possible lawsuit in defamation resulting from their words.
In Stevens v. Tillman, 855 F.2d 394, 402 (7th Cir.1988), cert. denied, 489 U.S. 1065, 109 S.Ct. 1339, 103 L.Ed.2d 809 (1989), the court held that charges of "racism" by community activists against a white school principal were not defamatory:
Accusations of "racism" no longer are "obviously and naturally harmful". The word has been watered down by overuse, becoming common coin in political discourse.... The speaker may use "she is a racist" to mean "she is condescending to me, which must be because of my race because there is no other *520 reason to condescend"  a reaction that attaches racial connotations to what may be an inflated opinion of one's self  or to mean "she thinks all black mothers are on welfare, which is stereotypical". Meanings of this sort fit comfortably within the immunity for name-calling.
... In daily life "racist" is hurled about so indiscriminately that it is no more than a verbal slap in the face; the target can slap back.... It is not actionable unless it implies the existence of undisclosed, defamatory facts, and Stevens has not relied on any such implication.
Under the analysis set forth in these authorities, defendant's verbal abuse of the plaintiffs was not defamatory. Plaintiffs failed to suggest any undisclosed, empirically verifiable facts which the audience at the condominium meeting could have understood to be implied by defendant's characterization of them as "Jew haters." Although another resident of the condominium told defendant she had overheard Mr. Ward make an anti-Semitic remark, defendant did not make that allegation at the condominium association meeting. Moreover, defendant was in a highly agitated state when he called Mrs. Ward a "bitch" and both Mr. and Mrs. Ward "Jew haters." Under these circumstances, any reasonable listener would have understood defendant's tirade to have been "merely giving vent to insult." Restatement (Second) of Torts, supra, § 566, comment e. Therefore, I would conclude plaintiffs failed to present any evidence from which a jury could find that defendant's characterization of plaintiffs as "Jew haters" alleged or implied any fact and thus the characterization was not defamatory.

II
Since the majority concludes that defendant's characterizations of plaintiffs were defamatory, it is necessary also to consider the sufficiency of plaintiffs' proofs of damages. To establish a slander claim, a plaintiff generally must show "special damage," which essentially means pecuniary harm. Prosser and Keeton on Torts § 112 at 793-94 (5th ed. 1984). To mitigate the sometimes harsh effects of this rule, the common law carved out four forms of slander, commonly referred to as slander per se, which do not require a showing of *521 "special damages," namely, a statement which (1) charges commission of a crime; (2) alleges an infection with a loathsome disease; (3) affects a person in his business, trade, profession or office; or (4) imputes unchastity to a woman. Gnapinsky v. Goldyn, 23 N.J. 243, 250, 128 A.2d 697 (1957); Arturi v. Tiebie, supra, 73 N.J. Super. at 222, 179 A.2d 539. The Restatement of Torts also recognizes that the slander per se doctrine is limited to these four categories of cases. Restatement (Second) of Torts, supra, §§ 570-574. If an alleged slander falls within one of these exceptions, a plaintiff may prevail not only without proving "special damages," but without proving any damages at all. Instead, damages are presumed simply from the making of the statement. Prosser, supra, § 112 at 788.
The majority concludes that in this State the slander per se doctrine is not restricted to the four categories of cases identified in Gnapinsky, Arturi and the Restatement but rather may be applied "in broad terms" to "make allowance for the infinitely varied forms of offense to reputation." Ante at 504, 623 A.2d at 289. The majority points to Printing Mart-Morristown v. Sharp Electronics Corp., supra, 116 N.J. 739, 563 A.2d 31, Romaine v. Kallinger, 109 N.J. 282, 537 A.2d 284 (1988), Lawrence v. Bauer Publishing & Printing, Ltd., 89 N.J. 451, 446 A.2d 469 (1982) and Hall v. Heavey, 195 N.J. Super. 590, 481 A.2d 294 (App.Div. 1984), as support for this more expansive view of the slander per se doctrine. However, these opinions did not involve the scope of the slander per se doctrine, that is, the circumstances under which a claim for slander can be established without proof of special damages, but rather the types of statements which are so manifestly damaging to reputation that the court may decide the question of defamatory meaning without submission to the jury. Although Printing Mart, contains a statement that "[w]ords that clearly denigrate a person's reputation are defamatory on their face and actionable per se," 116 N.J. at 765, 563 A.2d 31, it is clear from the context that the Court was only saying that the question of defamatory meaning need not be submitted to the jury if a *522 statement is defamatory on its face. In fact, the Court expressly stated that it was not dealing with the issue of damages:
Having come this far we must acknowledge that there remains the question of whether plaintiffs must allege damage and fault in the complaint. Neither plaintiffs nor defendants argue either issue, but both are important in determining whether plaintiffs have stated a cause of action or whether their action should fail at this preliminary stage.

[Id. at 769, 563 A.2d 31.]
In Romaine v. Kallinger, supra, 109 N.J. at 292-93, 537 A.2d 284, the Court held that a statement to the effect that plaintiff "knew a junkie" was, as a matter of law, non-defamatory. Thus, the Court had no occasion to consider whether plaintiff would have had to prove damage to reputation in order to recover. In Lawrence v. Bauer Publishing & Printing Ltd., supra, 89 N.J. 451, 446 A.2d 469, the alleged defamation consisted of an accusation of the commission of a crime and thus, if made verbally, would fall within one of the traditional categories of slander per se. In any event, the Court's use of the term "libel per se" was not directed at whether plaintiff was required to show actual damage to reputation in order to prevail:
The terms "libel per se" and "libel per quod" have long been used to differentiate between writings defamatory on their face and those defamatory solely in the light of extrinsic facts. [89 N.J. at 459, 446 A.2d 469.]
Like Lawrence, Hall v. Heavey, supra, involved an allegation of criminal conduct, and thus the case fits within one of the traditional categories of slander per se.
I believe that the majority's view that the foregoing cases involve the scope of the slander per se doctrine derives from the multiple usages of the term "per se" in the law of defamation. As explained by one commentator:
Slanders, unlike libels, were subdivided into two categories, those actionable without proof of special harm (per se) and those requiring special harm (per quod).
....

*523 A second, entirely different use of the term "per se" refers to defamation whose defamatory meaning is apparent on the face of the communication, or in other words, defamation whose defamatory character can be established without the introduction of extrinsic evidence.
[Rodney A. Smolla, Law of Defamation § 7.04 at 7-6, § 7.06[2] at 7-12 (1986).]
See also Herrmann v. Newark Morning Ledger, 48 N.J. Super. 420, 443-45, 138 A.2d 61 (App.Div. 1958). I read Printing Mart and Lawrence to use the term "per se" solely in the second sense identified in the above quote and thus not to involve the scope of the slander per se doctrine. Consequently, I am satisfied that no New Jersey case decided since Arturi v. Tiebie, supra, 73 N.J. Super. 217, 179 A.2d 539, casts any doubt on the limitation of the slander per se doctrine to the four categories of cases identified in Gnapinsky, Arturi and the Restatement. Moreover, I have been unable to locate case law in any other jurisdiction which would support the expansion of the slander per se doctrine beyond the four traditional categories.
I am also convinced that there is no policy reason supporting the majority's expansion of the slander per se doctrine. The slander per se doctrine is one of what were described in Gnapinsky, 23 N.J. at 250, 128 A.2d 697, as "quaint distinctions of historical genesis" which "burden" the law of defamation. The doctrine exempts four limited categories of slanders from the harsh rule that a cause of action for slander requires proof of "special damages," that is, damage of a pecuniary nature. However, the doctrine does not simply allow a person who is the target of an alleged slander per se to prove a case without showing any pecuniary loss, but instead dispenses entirely with the requirement of proof of any form of damage to reputation. Smolla, supra, § 7.03[2] at 7-4 to 7-5. This is sometimes referred to as the "presumed damages" doctrine. See Sisler v. Gannett Co., Inc., 104 N.J. 256, 281, 516 A.2d 1083 (1986). As one commentator has observed:
[T]he result is a quagmire of archaic, arbitrary, internally inconsistent rules. The chaos that now exists under this regime does neither plaintiffs nor *524 defendants any long term good. Some of the most serious and damaging defamatory statements are treated as requiring proof of special damages, artificially penalizing deserving plaintiffs. Some defamatory statements that are relatively innocuous to the modern ear, however, receive the hallowed status of being actionable per se. Courts constantly misuse the terminology, confusing concepts and precedent, precisely because they bear no connection to everyday thought, common sense, or any coherent legal policies. The only certainty in the confusion is that cases too often turn on the very sort of hypertechnical distinctions that have given the law of defamation a bad name, inviting exploitation by both sides.

[Smolla, supra, § 7.08 at 7-16.]
For similar reasons, another commentator has described the slander per se doctrine as a "judicial contortion." David A. Anderson, Reputation, Compensation, and Proof, 25 Wm. & Mary L.Rev. 747, 751 (1984).
The scholarly commentators who have criticized the slander per se doctrine do not advocate its expansion but rather its elimination. They recommend that the "presumed damages" rule applicable to slander per se cases and the "special damages" rule applicable to all other slander cases both be eliminated.[5] These rules should be replaced, these commentators conclude, by a single uniform rule that a plaintiff must prove actual damage to reputation, either pecuniary or non-pecuniary, to establish any cause of action for defamation. Anderson, supra, at 749, 774-78, Smolla, supra, § 7.08, at 7-16 to 7-17. One commentator states:
Special harm has always been a crude and clumsy screening device for separating deserving from undeserving plaintiffs.
....
Actual damages (proof of actual "injury," which need not be pecuniary) should be required in all cases.

*525 [Smolla, The Law of Defamation, supra § 7.08 at 7-17.]
Another commentator states:
[The] legitimate purpose [of defamation law is] compensating individuals for injury to reputation. Requiring proof of harm would reduce defamation to this purpose. The actual injury rule would bring defamation into line with the rest of tort law, which does not purport to punish wrongdoing or regulate activity in the absence of injury.
[Anderson, supra, 25 Wm. & Mary L.Rev. at 774.]
See also 2 Fowler V. Harper, Fleming James, Jr. and Oscar S. Gray, The Law of Torts § 5.14 at 116 (2d ed. 1986); Prosser, supra, § 112 at 794.
Most significantly, the Supreme Court of New Jersey has criticized the "presumed damages" doctrine and suggested that proof of actual damages may be required in all defamation actions. In Sisler v. Gannett Co., Inc., supra, 104 N.J. at 281, 516 A.2d 1083, the Court stated:
Injury to reputation, even more so than personal injury or mental anguish, which are both amenable to expert testimony, defies exact measurement. The type of direct testimony lacking here has traditionally been hard to produce; in fact, it was this difficulty that engendered the "presumed damages" doctrine. See [Gertz v. Robert Welch, Inc., 418 U.S.] at 375, 94 S.Ct. at 3024, 41 L.Ed.2d at 825 (White, J., dissenting). However, the inherently amorphous quantification of libel damages potentially enables juries to vary damages awards in accordance with the popularity or unpopularity of the speaker or the view expressed. See Anderson, "Reputation, Compensation, and Proof," 25 William & Mary L.Rev. 747 (1984). Accordingly, a plaintiff should offer some concrete proof that his reputation has been injured. One form of proof is that an existing relationship has been seriously disrupted, reflecting the idea that a reputation may be valued in terms of relationships with others. Ibid.

Although the discussion in Sisler is constructed around the limitations imposed by Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) upon damage awards in defamation actions involving issues of public concern, the Court's comments do not appear limited to that kind of case. Thus, Sisler suggests that the Court may now require proof of actual damages in all defamation cases. At the very least, Sisler indicates that the slander per se doctrine, under which a cause of action may be established without proof of any actual damage to reputation, should not be expanded. Therefore, I would conclude that plaintiffs were required to prove actual *526 damage to their reputations, either of a pecuniary or non-pecuniary nature, in order to prove their slander claim against defendant.
I also would conclude that plaintiffs failed to present such evidence. One of plaintiffs' witnesses who attended the condominium meeting testified that he did not believe defendant's statement that Mrs. Ward hates Jews and that defendant's tirade did not affect his view of the plaintiffs. No other witness testified that defendant's statement affected plaintiffs' reputations. Mrs. Ward stated that she sensed a "coolness" towards her and "... we weren't invited to things that we had been invited to before; and several people did mention it to me." In my view, such vague, subjective impressions provide an inadequate foundation for a finding of actual damage to plaintiffs' reputations. See Sisler v. Gannett Co., Inc., supra, 104 N.J. at 281, 516 A.2d 1083 ("Awards based on a plaintiff's testimony alone or on `inferred' damages are unacceptable."). The jury's verdicts, first awarding no "special damages" to either plaintiff, and then, after the court sent them back for further deliberation, awarding $1 "special damages" and $1 "general damages" to each plaintiff, reinforce my conclusion that plaintiffs failed to present any evidence of actual damage to their reputations as a result of defendant's invective against them.
Accordingly, I would reverse the judgment in favor of plaintiffs.
NOTES
[1] The meeting at which the statement was made was attended by the company's physical plant director and its personnel director, in addition to plaintiff and defendant.
[2] In its footnote 4 the dissenting opinion notes a number of other decisions arising from suits brought by the same plaintiff against newspapers in different states, holding the same defamation to be non-actionable. These decisions were reached on the basis of local law or the status of the plaintiff as an elected public official, a consideration which is clearly not present here.
[1] In a somewhat similar fashion, the tentative draft of the proposed Uniform Defamation Act (UDA), as revised January 5, 1993, would provide that a defamation must be a "factual statement," § 2-101(1), which is defined as "... a communication that is reasonably understood by recipients to be of a factual nature and is objectively provable or disprovable." § 1-101(2); see also Milkovich v. Lorain Journal Co., 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).
[2] The trial court's jury instructions regarding plaintiffs' slander claims did not distinguish between defendant's characterization of Mrs. Ward as a "bitch" and as a "Jew hater." The trial court informed the jury that in the Random House College Dictionary "the slang for `bitch' has been defined as a malicious, unpleasant, selfish woman."
[3] Under some circumstances, verbal abuse might be sufficiently outrageous and harmful to the target to give rise to a cause of action for intentional infliction of emotional distress. See Jean C. Love, Discriminatory Speech and the Tort of Intentional Infliction of Emotional Distress, 47 Wash. & Lee L.Rev. 123 (1990); but cf. Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). However, plaintiffs' claims were based solely on slander. Therefore, this case is not a suitable occasion to consider whether, or under what circumstances, verbal abuse could constitute intentional infliction of emotional distress.
[4] I note that the Second Circuit's decision was only one of eight published opinions involving the same alleged defamation of Congressman Sweeney, Sweeney v. Patterson, 128 F.2d 457 (D.C. Cir.1942); Sweeney v. Philadelphia Record Co., 126 F.2d 53 (3d Cir.1942); Sweeney v. Caller-Times Pub. Co., 41 F. Supp. 163 (S.D.Tex. 1941); Sweeney v. Capital News Pub. Co., 37 F. Supp. 355 (D.Idaho 1941); Sweeney v. Beacon Journal Pub. Co., 66 Ohio App. 475, 35 N.E.2d 471, appeal dismissed, 138 Ohio St. 330, 34 N.E.2d 764 (1941); Sweeney v. Dispatch Printing Co., 42 N.E.2d 940 (Ohio Ct. App. 1942); Sweeney v. Newspaper Printing Corp., 177 Tenn. 196, 147 S.W.2d 406 (1941), as well as numerous unpublished opinions, see Sweeney v. Caller-Times Pub. Co., supra, 41 F. Supp. at 165. Every court other than the Second Circuit ruled that this alleged defamation was not actionable under the law of that jurisdiction. I also note that today a claim such as the one involved in the Sweeney cases undoubtedly would be dismissed under the "actual malice" standard of New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).
[5] The tentative draft of the proposed Uniform Defamation Act, as revised January 5, 1993, also would eliminate presumed damages from the law of defamation and expand the scope of actual damages recoverable in slander actions which fall outside the slander per se doctrine. See tentative draft of proposed UDA § 2-102 and the comment thereto.