49 N.J. Super. 551 (1958)
140 A.2d 529
LEWIS M. HERRMANN, PLAINTIFF-RESPONDENT,
v.
NEWARK MORNING LEDGER CO., A CORPORATION OF NEW JERSEY, SAMUEL I. NEWHOUSE, PHILIP HOCHSTEIN AND TOM GALLAGHER, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Submitted March 27, 1958.
Decided April 18, 1958.
*552 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Harold Krieger argued the cause for defendants-appellants (Mr. Benjamin H. Chodash on the brief).
Mr. Harry Green argued the cause for plaintiff-respondent (Mr. Gordon N. Litwin, attorney).
*553 The opinion of the court was delivered by CONFORD, J.A.D.
On January 13, 1958 we reversed a judgment for the plaintiff in the foregoing libel action for reasons fully set forth in the opinion of the court, reported in 48 N.J. Super. 420, and remanded the cause for retrial. To facilitate the disposition of the entire controversy on the retrial we undertook consideration of the question whether the publication complained of was libelous in respect of the sting charged by the plaintiff on the appeal, but not in the retrial order, that he was defamed by being associated with Communism. We determined that plaintiff should be allowed to amend the complaint and pretrial order and that if the facts in the complaint, as amended, were established, the publication was libelous in the sense stated as a matter of law and should be so considered on the remand (saving defendants' defenses as to truth, fair comment, etc.).
Defendants filed a petition for rehearing, complaining, not of the judgment, but of the opinion of the court in the respects, inter alia, (b) "that the Court had insufficient facts upon which to determine that a substantial number of people would infer from the article (after amendment) that the plaintiff had Communistic leanings," and (e) "that no opportunity was afforded to the defendants to brief the point as to the defamatory character of the remarks concerning the adoption of the resolution." Reference is made to the full text of the opinion for enlightenment as to the significance of these points. As it was true that these questions had not been argued in the initial briefs we granted the petition. Full supplemental briefs have been filed on both of the points, including the merits of the subject referred to in "(e)."
The first point argued by defendants is based upon a misconception of the nature of our determination. We did not make the determination complained of on the basis of any evidence in the case as tried. We concluded, as a matter of law, based on aspects of current public opinion so commonly held by some segments of the general public as to be a matter of common knowledge to the well-informed, *554 that such elements of the public, not fairly to be described as disrespectable or negligible, would regard the opponent of the substance of a resolution supporting a City of Newark policy to discharge teachers and other city employees who plead the Fifth Amendment in investigations of Communism, as sympathetic with Communists, and therefore hold him in disrepute. On that basis, and applying the established rule that words are actionable if the plaintiff would be demeaned thereby in the eyes of a "substantial number of respectable people" in the community, whether or not "right-thinking" (48 N.J. Super. at page 439), we held the publication defamatory as a matter of law in the respect stated.
It is true that we referred in our opinion to testimony that a number of people did regard the plaintiff as a Communist after reading the article, but this was merely illustrative comment, not intended to signify that the basis for our conclusion was laid in the evidence adduced at the trial. It was not.
We indicated in our previous opinion why we entertained the view that in a case of this kind the court should not delegate to a jury the issue of the existence in the community of a substantial number of people in whose eyes the questioned writing would demean the plaintiff (48 N.J. Super. at pages 440-442). In the light of defendants' supplemental brief, some further comment on the subject may be helpful.
To be distinguished is the situation wherein the defamatory impact of the writing is not dependent upon the mental habits or political or social views or biases of the public or some of its members, but where there is merely an ambiguity as to what the words mean, semantically, the court finding two meanings reasonably possible, one derogatory and the other not. Here the law hypothesizes a single readership mentality (albeit, in many cases, unrealistically) and the inference by the entirety of that readership of only one of the two meanings. It then becomes the jury's function from the evidence to determine which of the two potential *555 meanings was drawn by the readership (48 N.J. Super. at page 430).
When we pass from the field of meaning to that of the defamatory effect of unambiguous language, dependent upon a particular reader's biases, logical mental processes and political or social views, we are no longer dealing with alternative potential reactions to a given writing by the presumed unitary general readership of the publication, but with the problem of two distinct segments of the reading public, in one of which the unambiguous writing excites "scorn, aversion or hostility" (Grant v. Reader's Digest Ass'n, 151 F.2d 733, 735 (2 Cir. 1945), certiorari denied 326 U.S. 797, 66 S.Ct. 492, 90 L.Ed. 485 (1946)) toward the subject of the writing, and in the other not. As we have shown, under the prevailing American rule, the court is not concerned, within broad limits, with whether the segment of the public which thinks odiously of plaintiff because of the facts stated in the publication is "right-thinking" (48 N.J. Super. at page 439). It is sufficient that it be "substantial" and "respectable." In that case the false writing, realistically, is as hurtful to plaintiff as though the harmful imputation were drawn only by paragons of fair, unbiased and logical judgment. As stated by Prosser, "The American courts have taken a more realistic view, recognizing that the plaintiff may suffer real damage if he is lowered in the esteem of any substantial and respectable group, even though it be a minority one, with ideas that are not necessarily reasonable." Law of Torts (1955 ed.), § 92, p. 577.
It will at once be obvious that, in most cases, the existence of a substantial segment of the community in whose eyes the plaintiff will be demeaned by reason of the facts stated in the questioned publication cannot practicably be an issue for factual proof in a trial. To attempt to project such an issue for resolution by a jury would generally be futile, if for no other reason than the impossibly great number of witnesses who would have to be called. This is peculiarly the kind of fact, i.e., the existence of an appreciable segment *556 of community opinion in respect to a specific subject, which, if it exists, is so generally known that the fact ought to be for declaration by the court. The danger of a jury deciding the issue on the basis not of the actual existence of the described segment of community opinion (whether or not it is predominant) but of their own private predilections on the subject matter, or on the sparse evidence of the testimony of a bare sprinkling of the public as witnesses, is such that the interests of a just effectuation of the substantive rule of law are better served by the court determining the fact where fair minds would agree that there could be no reasonable difference of opinion as to the existence in the community of a substantial number of respectable people who would draw the invidious inference concerning the plaintiff from the publication.
While courts frequently have assumed that the question of the defamatory character of this kind of imputation is to be given to the jury (see cases cited in Annotation, 33 A.L.R.2d 1196 (1954)), we have found none in which the issue has been precisely posed, as here and in our prior opinion, or a satisfactory answer provided to the question as to why, in principle, what the court knows to be a fact should be submitted to a jury for a possible contrary conclusion. It appears that in those cases where the courts feel that the great majority of the public would regard the plaintiff with lessened esteem because of the charge they will find the writing libelous per se (as a matter of law). Wright v. Farm Journal, 158 F.2d 976 (2 Cir. 1947) (charge of being a Communist Party member); Utah State Farm Bureau Federation v. National Farmers Union Service Corp., 198 F.2d 20, 33 A.L.R.2d 1186 (10 Cir. 1952) (charge that plaintiff union was "Communist-dominated"); Collins v. Oklahoma State Hospital, 76 Okl. 229, 231, 184 P. 946, 947 (Sup. Ct. 1916) (referring to a white person as "colored," in the State of Oklahoma). But there can surely be no logically justifiable distinction based on the size of the proportion of the public (so long as substantial) which holds the odious view of the plaintiff, *557 and none has been suggested in any reported case of which we are aware in a jurisdiction rejecting the "right-thinking" criterion. If, as is held, it takes only a substantial number of people who hold such a view of plaintiff to make the harmful false writing actionable, the function of deciding the defamatory nature and effect of the writing, as between court and jury, should not rest on a different basis than where the harmful view is more widely held. All that is material is whether there is any factual doubt that the substantial group exists, though not a majority, which entertains the opinion that plaintiff's reported conduct is opprobrious.
Defendants argue that even where the "right-thinking" rule is not followed the court will not accept a defamatory meaning which only the "evil-minded" would place upon "innocent words" and that no defamation will be found if the "group who will think the worse of the plaintiff is so small as to be negligible, or one whose standards are * * * clearly anti-social," citing Prosser, op. cit., supra, § 92, pp. 577, 581. Fully accepting the author's caveat we cannot agree with defendants' contention that it is applicable here.
For present purposes we assume a finding on the retrial that the publication sued upon charged as a fact that plaintiff opposed the substance of the resolution supporting the Newark policy of discharging city employees pleading the Fifth Amendment in investigations of Communism. We reject, in passing, defendants' argument that a jury could find that the article meant only that plaintiff opposed Messrs. Murphy and Marciante generally, not necessarily in reference to the adoption of the contentious resolution. A reading of the whole article leaves no reasonable doubt that it meant plaintiff was opposing the named persons in reference to their respective positions on the substance of the resolution. It is to be presumed that if plaintiff's reputation was thereby lowered with some people whose good opinion was important to him, as charged by plaintiff, those people attained that state of mind by the assumptions that the employees in question probably were or had been Communists *558 and that plaintiff's opposition to the resolution indicated sympathy with the teachers and with their putative Communistic beliefs and associations. We found in our prior determination and we adhere to the conclusion that a substantial number of people in the community would and did entertain those inferences and conclusions concerning the plaintiff. Our finding is not from the testimony in the case but upon common knowledge of the existing currents and eddies of public opinion in cases of this kind.
It should be unnecessary to state that this finding does not imply our approval or disapproval of the logic, fairness or justification of such inferences and conclusions. Our reactions in that regard would be irrelevant. The determination of a point of libel law is not an exercise in social or political philosophy or in pure logic. It is the result of an inquiry into justifiable rules for remedying harm to reputation by words. We must take public opinion and mental reactions as we find them in living society, not as one might visualize them in a Utopia. For this purpose "society is to be taken as it is, with its recognized prejudices, without determining whether they are well founded in reason or justice." Van Wiginton v. Pulitzer Pub. Co., 218 F. 795, 796 (8 Cir. 1914) (publication of picture of plaintiff as daughter of man sentenced to be executed for murder). The consideration that such public views and reactions may not be soundly founded in aseptic logic and may be charged by current high feeling in respect to the threat of Communism cannot justify the court in disregarding them as "evil-minded" or "clearly anti-social," as argued by defendants. But cf. Connelly v. McKay, 176 Misc. 685, 28 N.Y.S.2d 327 (Sup. Ct. 1941) (charge that plaintiff informed on truck drivers who violated I.C.C. regulations held not defamatory). They are widely prevalent with people whose good opinion is of moment to plaintiff, and that is all that matters, for present purposes.
In the leading case of Grant v. Reader's Digest Ass'n, supra, the court (L. Hand, J.) disposed of the contention that it was less defamatory to impute of a plaintiff that *559 he was a "fellow-traveller" than an outright Communist party member. It said (151 F.2d at page 735):
"Any difference is one of degree only: those who would take it ill of a lawyer that he was a member of the Party, might no doubt take it less so if he were only what is called a `fellow-traveler'; but since the basis for the reproach ordinarily lies in some supposed threat to our institutions, those who fear that threat are not likely to believe that it is limited to party members. Indeed, it is not uncommon for them to feel less concern at avowed propaganda than at what they regard as the insidious spread of the dreaded doctrines by those who only dally and coquette with them, and have not the courage openly to proclaim themselves."
We do not suppose that defendants would contend that if any of their readers drew the inference from the article complained of that plaintiff supported the position of the city employees refusing to testify as to Communist status or associations under plea of the Fifth Amendment, such readers would be classifiable as being "evil-minded" or as having "clearly anti-social standards" if they drew the further inference that plaintiff was a sympathizer with Communists, even though defendants might intellectually differ with that inference. Yet plaintiff argues that there is evidence in the case as tried that defendants themselves drew from the facts they reported in the article sued upon the inference that plaintiff was a supporter of the teachers. He cites an article by the same reporter who wrote the article complained of, published in defendants' paper just one week later, in which there is speculation concerning a forthcoming meeting of the Essex Trades Council which is expected to "face up to the issue of what's to be done about Fifth Amendment pleaders." There is discussion of the activities of the Newark Teachers Union, which was "seeking funds to help fight a threatened ouster of three members" who had pleaded the Fifth Amendment at a congressional investigation. It is said that at the coming meeting "supporters of the teachers should not be lacking"; further, "In addition, the teachers may be said to have very articulate reinforcement in the person of two old time *560 Council delegates * * * Lewis M. Herrmann, labor editor and Richard Ryan, new president of ITU local 103." There is reference to "Herrmann's defense of the teachers" as contributing "much drama to the discussion on Fifth Amendmenteers which enlivened the State Federation Shore meeting" (at which there was debated the resolution involved in the present action). The article concludes with the note that "ETC delegates and other AFL people" were asking why "certain Jersey labor figures  together with some of the country's best known Reds  signed a `labor call' a few years ago to a Chicago `Peace Conference.'"
The second article referred to was introduced at the trial to show malice. We cannot agree with plaintiff's present suggestion that it is evidence of the defamatory character of the article sued upon. It does at least indicate, however, that it is not as clear as defendants contend, that we may fairly categorize as persons of "clearly anti-social standards," or as "evil-minded," such members of the general public as would infer from the facts stated concerning the plaintiff in the article in suit that plaintiff was a sympathizer with the teachers and other city employees involved.
This court is keenly aware of the consideration that any broadening of concepts as to what is defamatory necessarily contracts the desirable range of freedom of expression. The problem always is the extremely delicate one of accommodating the widest latitude of such freedom within necessary minimum standards for protection of the interests of the individual in freedom from unjustifiable injury to reputation. These standards are necessarily flexible in relation to the kind of problem which concerns us here. They vary with time, circumstance and the condition of public sentiment. 1 Harper and James, Law of Torts (1956), § 5.1, p. 353. In times which were already of long standing by 1955 the thoroughly justified popular revulsion at Communism and all its works, in this state and country, was such that the merest public suggestion of association by an individual with any phase of that doctrine, remote or near, had fearsome capacity for injury to reputation. It *561 still does. It seems to us plain, in consonance with fundamental principles of tort liability, which correlate the degree of duty to avoid harm to others with the risk of such harm inherent and foreseeable in a given factual setting, that those who write about others in such a climate of public opinion should justly be held accountable for the harm they occasion, according to standards of what is defamatory geared realistically to the actualities. Nothing less will efficiently serve the interests of a justly remedial jurisprudence in this specific demesne of the law of defamation. Both the heightened potential for damage to reputation in current public sensitivity to Communism and subversion and the deep and irreparable nature of the harm when done require that those who take the risk of writing that about others which in fact does such damage be held to do so at their peril if the utterance be untrue and otherwise legally unjustified.
Our consideration of the briefs on the rehearing leads to the conclusion that the determinations in the previous opinion complained of should stand as rendered, and it will be so ordered.