643 A.2d 972

CHARLES C. WARD AND MARY B. WARD, PLAINTIFFS–RESPONDENTS, v. JOHANAN ZELIKOVSKY, DEFENDANT–APPELLANT.

Argued January 5, 1994—Decided June 20, 1994.

*Gerard W. Quinn* argued the cause for appellant (*Cooper, Perskie, April, Niedelman, Wagenheim & Levenson,* attorneys; *Mr. Quinn* and *Russell L. Lichtenstein,* on the briefs).

*Arthur L. Shanker* argued the cause for respondents (*Weiner & Shanker,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal concerns whether words spoken between two condominium owners at a board meeting of their condominium association constitute slander, and if so, whether plaintiffs have proven sufficient damages to permit a punitive-damages award.

I

Defendant, Johanan Zelikovsky, and plaintiffs, Mary and Charles Ward, own condominiums in the Ocean Club condominium association, a complex of 725 units. They, together with approximately one hundred other condominium residents, attended a July 30, 1989, Board meeting of the condominium association. During the meeting, Mr. Ward addressed the Board on a topic relating to the business of the condominium. While Mr. Ward was speaking, Mrs. Ward stood to add her comments. Mrs. Ward testified that at that moment Zelikovsky, who was seated a few rows in front of her, "jumped up and said, 'Don't listen to these people. They

don't like Jews. She's a bitch. I remember her. She's a bitch.' "
Mr. Ward described Zelikovsky's behavior as follows,

> [Zelikovsky] leaped up and turned around and screamed, "I know her. She's a bitch. These people, they hate Jews. These people hate Jews." And he was addressing his remarks to the board, but he was pointing and going on and on and start[ed] flailing his arms again. At that point the chairman or the president of the board, who has a microphone, said, "Sit down, John. Sit down, John."

The security guard standing at the door to the conference room testified that he heard Zelikovsky's comments and became concerned that a fight might ensue. Zelikovsky's comments were wholly unrelated to the subject on which Mr. and Mrs. Ward had been speaking.

The Wards filed suit against Zelikovsky for slandering them at the condominium association meeting and sought special, compensatory and punitive damages. In addition, the lawsuit charged Zelikovsky with assault and battery for an incident that had occurred the prior year. The Wards and friends visiting from Connecticut were going to dinner and a racetrack. While Mrs. Ward and some of the guests were waiting for Mr. Ward to bring his car to the front of the condominium, one of the guests was handing out sheets with his recommended picks for that evening at the racetrack. Zelikovsky testified that he mistook the sheets for advertisements encouraging time-sharing at the condominium, a practice to which he was vehemently opposed. He demanded a copy but the guest stated that the sheets were only for his friends. Mrs. Ward walked over to the two men and then Zelikovsky began yelling at Mrs. Ward and poked or pushed her during the argument. The jury found in favor of Mrs. Ward on her assault and battery claim against Zelikovsky but found no damages. The assault and battery claim is no longer at issue; this appeal solely addresses Zelikovsky's alleged slander.

At trial, Mrs. Ward testified that Zelikovsky's outburst caused her legs to start shaking. She testified that she "sat down; and [ ] was going to cry; and then I thought, 'I'm not going to do this in front of people' because everybody was turning around and was

looking at us ... and I was embarrassed—terribly embarrassed." Mr. Ward testified that he felt "upset, frustrated, embarrassed."

After the meeting, people came up to Mrs. Ward and commented on the incident. Mrs. Ward stated, "In the elevator on up to our place, people commented on it; and I was very embarrassed because how do you stand up and say, 'That's not true. That's not true.'" Although Mrs. Ward would not introduce the topic herself, when others mentioned it, she would say, "I'm not. Really I'm not." or "Haven't I always been nice to you?"

During her tenure as head of the condominium's "Sunshine Committee," Mrs. Ward's duties included sending a large number of cards to Ocean Club residents for Jewish holidays and bar mitzvahs, from which she concluded that the Ocean Club had a large Jewish population. Mr. Ward explained that it was not only a "Jewish issue," however, because "[i]f people think ... you don't like Jews, non-Jews may not like you or want to do business with you either." Following Zelikovsky's comments, Mrs. Ward stated that she was embarrassed and hesitant to participate in activities at the condominium.

As a realtor in Margate, Mrs. Ward also feared that her co-workers, many of whom were Jewish, might learn of Zelikovsky's statement and ask her about it. Mr. Ward had sold his business and was in the process of going into real estate himself. He stated that "just the rumor that you, quote, 'Don't like Jews,' is probably enough not to do business in Margate." Mr. Ward testified that his plan to buy a real estate company at the Ocean Club had not been consummated, perhaps in part because of Zelikovsky's statement.

On cross-examination, Mrs. Ward testified that she had "no idea" whether the statements had caused her to lose business, but [that they] did affect her life at the Ocean Club. After the incident, she felt that "[a] very important part of our lives was taken away from us which was the joy of being at Ocean Club." She stated that the difference after the comment was that she felt a "coolness" that had not existed prior to the statement. She

stated that "we weren't invited to things that we had been invited to before; and several people did mention it to me."

Mr. Ward also testified that he found less enjoyment living at the Ocean Club after the incident. He testified that he "absolutely felt a chill and a coolness of many relationships that he had" at the Ocean Club and that he had avoided certain functions that he knew Zelikovsky frequented. He noted that the other owners had excluded him and his wife from a celebration party following an owners-board election. Zelikovsky had been the principal financier for the newly-elected board's campaign. On cross-examination, Mr. Ward admitted that nobody had actually said, "Hey, we're having this celebration; but we don't want you to go to it."

Defendant did not deny making the critical statement about the Wards but claimed that he was merely speaking to a friend seated beside him. He testified that Sheila Polin, another resident at Ocean Club, had told him that she had heard Mr. Ward make an anti-Semitic remark. Polin testified that Mr. Ward had in fact made a comment to her about Jews that she considered derogatory (although she could not remember the substance of the comment) and that she had told Zelikovsky about that exchange.

Plaintiffs sought admission of Zelikovsky's tax returns to assist the jury if it decided to award punitive damages. The court admitted the returns into evidence over Zelikovsky's objection that the returns should not be admissible because debts and other liabilities were not represented in the returns.

The trial court determined that plaintiffs were required to show special damages because the offensive remarks were not within the four recognized categories of slander *per se*, namely, statements that impute (1) commission of a crime, (2) contraction of a loathsome disease, (3) occupational incompetence or misconduct, and (4) unchastity of a woman. *Gnapinsky v. Goldyn*, 23 *N.J.* 243, 250–51, 128 *A.*2d 697 (1957). The jury instruction sheet therefore noted that special damages were a prerequisite to recovery, and it required deliberations to cease as to each plaintiff if the jury found no special damages for that plaintiff.

The jury found that defendant had slandered Mary Ward but that she had sustained no special damages. Ignoring the court's instructions that deliberations should then cease concerning that plaintiff, the jury also determined that Mrs. Ward had sustained general damages, but it awarded no compensatory damages. Finally, the jury awarded Mrs. Ward punitive damages of $25,000. The jury also found that defendant had slandered Mr. Ward and that the plaintiff had sustained special and general damages, but that the amount of such damages was zero. The jury awarded Mr. Ward, too, punitive damages in the amount of $25,000.

The trial court then reminded the jury that only if special damages were found could other damages be awarded. The court suggested that the jury might wish to achieve its purpose by awarding nominal special damages to support the punitive-damages award and sent the jury back for reconsideration of its verdict. Not surprisingly, the jury's second verdict found that Mr. and Mrs. Ward had each sustained special damages of $1, general damages of $1, and again awarded each plaintiff punitive damages of $25,000.

Zelikovsky moved for a new trial on the slander claim, which the court denied. He then appealed. The Appellate Division affirmed the trial court's judgment, with one judge dissenting. 263 *N.J.Super.* 497, 623 *A.*2d 285 (1993). The majority of the Appellate Division expanded the four traditional categories of slander *per se* to include imputations of racial or ethnic bigotry, thus determining that proof of special damages was not necessary. *Id.* at 511–12, 623 *A.*2d 285. The Appellate Division also upheld the punitive damage awards. *Id.* at 513, 623 *A.*2d 285.

The dissent rejected the majority's view that defendant's characterization of plaintiffs as anti-Semitic was defamatory as a matter of law and that the statements qualified as slander *per se,* which did not require proof of special damages. *Id.* at 513, 623 *A.*2d 285. Moreover, the dissent concluded that even if the statements were defamatory, plaintiffs had failed to prove special damages. *Id.* at 526, 623 *A.*2d 285. Thus, the members of the

Appellate Division panel unanimously agreed that defendant's statement was not slanderous under any of the traditional four categories of slander *per se,* and that plaintiffs had not proven any special damages. They disagreed, however, over whether defendant's statement was defamatory, and over whether they should expand the four traditional categories of slander *per se* to include statements of religious and ethnic bigotry.

Zelikovsky appealed as of right pursuant to *Rule* 2:2–1(a). We also granted defendant's petition for certification, 134 *N.J.* 476 (1993), which seeks a review of the punitive-damage awards.

## II

█ The outcome of this case is the same whether we rely on Mr. Ward's or Mrs. Ward's version of the colloquy. We must determine whether the characterization of Mrs. Ward as a "bitch" and the claim that the Wards "don't like" or "hate" Jews are slanderous. In essence, this case concerns a verbal dispute between neighbors and thus is considerably different from libel cases involving media defendants. *See Milkovich v. Lorain Journal Co.,* 497 *U.S.* 1, 110 *S.Ct.* 2695, 111 *L.Ed.*2d 1 (1990); *Gertz v. Robert Welch, Inc.,* 418 *U.S.* 323, 94 *S.Ct.* 2997, 41 *L.Ed.*2d 789 (1974); *Sisler v. Gannett Co., Inc.,* 104 *N.J.* 256, 516 *A.*2d 1083 (1986); *Kotlikoff v. The Community News,* 89 *N.J.* 62, 444 *A.*2d 1086 (1982). A jury can generally assume that a measure of thought preceded the words printed in a newspaper or magazine. In contrast, spoken words often do not evidence that a similar level of deliberation preceded them. *See Restatement (Second) of Torts* § 568(3) (1977). This distinction is significant because the apparent deliberation of the speaker or writer will influence how a reasonable audience perceives the speech.

█ The law of defamation exists to achieve the proper balance between protecting reputation and protecting free speech. The threshold inquiry in a slander lawsuit is "whether the language used is reasonably susceptible of a defamatory meaning." *Kotlikoff, supra,* 89 *N.J.* at 67, 444 *A.*2d 1086.

The *Restatement (Second) of Torts* § 559 defines a defamatory statement as one that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 111, at 773 (5th ed. 1984), defines defamation as "that which tends to injure 'reputation' in the popular sense; to diminish the esteem, respect, good-will or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him." (Footnotes omitted.)

Whether the meaning of a statement is susceptible of a defamatory meaning is a question of law for the court. *Kotlikoff, supra,* 89 *N.J.* at 67, 444 *A.*2d 1086. In determining whether the statements are defamatory, we must consider the content, verifiability, and context of the challenged statements.

### A. Content

Courts begin their review to determine whether a statement is susceptible of a defamatory meaning by looking " 'to the fair and natural meaning which will be given it by reasonable persons of ordinary intelligence.' " *Romaine v. Kallinger,* 109 *N.J.* 282, 290, 537 *A.*2d 284 (1988) (quoting *Herrmann v. Newark Morning Ledger Co.,* 48 *N.J.Super.* 420, 431, 138 *A.*2d 61 (App. Div.), *aff'd on reh'g,* 49 *N.J.Super.* 551, 140 *A.*2d 529 (App.Div. 1958)).

Although perhaps directly injurious to a person, name-calling does not have a defamatory content such that harm to reputation can be shown. The First Amendment "does not embrace the trite wallflower politeness of the cliche that 'if you can't say anything good about a person you should say nothing at all.' " Rodney A. Smolla, *Law of Defamation,* § 6.09[2], at 6–37 (1986). Indeed, "name calling, epithets, and abusive language, no matter how vulgar or offensive, are not actionable." *Id.* at § 6.12[9], at 6–54. "No matter how obnoxious, insulting or tasteless such name-

calling, it is regarded as a part of life for which the law of defamation affords no remedy." *Id.* at § 4.03, at 4–11.

The *Restatement (Second) of Torts* succinctly differentiates between actionable defamatory statements and non-defamatory name-calling:

> There are some statements that are in form statements of opinion, or even of fact, which cannot reasonably be understood to be meant literally and seriously and are obviously mere vituperation and abuse. A certain amount of vulgar name-calling is frequently resorted to by angry people without any real intent ·to make a defamatory assertion, and it is properly understood by reasonable listeners to amount to nothing more. This is true particularly when it is obvious that the speaker has lost his temper and is merely giving vent to insult. Thus when, in the course of an altercation, the defendant loudly and angrily calls the plaintiff a bastard in the presence of others, he is ordinarily not reasonably to be understood as asserting the fact that the plaintiff is of illegitimate birth but only to be abusing him to his face. No action for defamation will lie in this case.
>
> [§ 566 comment e.]

Courts thus distinguish "between genuinely defamatory communications as opposed to obscenities, vulgarities, insults, epithets, name-calling, and other verbal abuse." Smolla, *supra*, § 4.03, at 4–10. Likewise, courts differentiate between defamatory statements and statements of rhetorical hyperbole. *Id.* at § 4.04[1], at 4–12.

## B. Verifiability

Courts have used two tests to determine if a statement is capable of a defamatory meaning: (1) was the statement one of opinion or fact, or (2) was it one of fact or non-fact. Smolla, *supra*, § 6.01[1], at 6–3; § 6.01[2], at 6–5. Those distinctions have generally proven unsatisfactory and unreliable.

At the core of those tests, however, are certain fairly well-established principles. True statements are absolutely protected under the First Amendment. 2 Fowler V. Harper et al., *The Law of Torts* § 5.1, at 42 (2d ed. 1986) (stating "[T]he law makes truth a defense ... because the utterance of truth is in all circumstances an interest paramount to reputation."). Factual statements, unlike non-factual statements, are uniquely capable of objective proof of truth or falsity.

Opinion statements, in contrast, are generally not capable of proof of truth or falsity because they reflect a person's state of mind. Hence, opinion statements generally have received substantial protection under the law. As the United States Supreme Court stated in oft-quoted dicta, "Under the First Amendment there is no such thing as a false idea." *Gertz, supra,* 418 *U.S.* at 339, 94 *S.Ct.* at 3007, 41 *L.Ed.*2d at 805.

The Supreme Court recently clarified its statement in *Gertz* by explaining that it had not "intended to create a wholesale defamation exemption for anything that might be labeled 'opinion.'" *Milkovich, supra,* 497 *U.S.* at 18, 110 *S.Ct.* at 2705, 111 *L.Ed.*2d at 17 (1990). Harm from a defamatory opinion statement is redressable when the statement implies underlying objective facts that are false. *See id.* at 18–20, 110 *S.Ct.* at 2705–06, 111 *L.Ed.*2d at 17–18. Only if a reasonable factfinder would conclude that the statements imply reasonably specific assertions of fact will the harm be redressable. *Ibid.*

The significance of opinion/fact and non-fact/fact distinctions centers on the concept of verifiability. Requiring that a statement be verifiable ensures that defendants are not punished for exercising their First Amendment right to express their thoughts. Unless a statement explicitly or impliedly rests on false facts that damage the reputation of another, the alleged defamatory statement will not be actionable. We require verifiability because "[i]nsofar as a statement lacks a plausible method of verification," the trier of fact who is charged with assessing a statement's truth "will have considerable difficulty returning a verdict based upon anything but speculation." *Ollman v. Evans,* 750 *F.*2d 970, 979 (D.C.Cir.1984), *cert. denied,* 471 *U.S.* 1127, 105 *S.Ct.* 2662, 86 *L.Ed.*2d 278 (1985).

Thus, only if Zelikovsky's statement suggested specific factual assertions that could be proven true or false could the statement qualify as actionable defamation. The higher the "fact content" of a statement, the more likely that the statement will be

actionable. Smolla, *supra*, § 6.06[3], at 6–24. Plaintiff prevails, however, only if the underlying or implied facts are untrue. "[L]oose, figurative or hyperbolic language" will be less likely to imply specific facts, and thus more likely to be deemed non-actionable as rhetorical hyperbole or a vigorous epithet. *Milkovich, supra*, 497 *U.S.* at 17, 21, 110 *S.Ct.* at 2705, 2707, 111 *L.Ed.*2d at 16, 19.

### C. Context

■ Courts do not automatically decide a case on "[t]he literal words of the challenged statement." Smolla, *supra*, § 6.03[8][a], at 6–16.16. Rather, courts must "consider the impression created by the words used as well as the general tenor of the expression," as experienced by a reasonable person. *Ibid.; see Immuno AG. v. Moor–Jankowski,* 77 *N.Y.*2d 235, 566 *N.Y.S.*2d 906, 909–107, 567 *N.E.*2d 1270, 1273–74, *cert. denied,* 500 *U.S.* 954, 111 *S.Ct.* 2261, 114 *L.Ed.*2d 713 (1991).

■ When considering the statement's "fair and natural" meaning, therefore, courts permit the context in which the statement appears to inform its determination of whether the statement was capable of a defamatory meaning. *See Cibenko v. Worth Publishers, Inc.,* 510 *F.Supp.* 761, 764 (D.N.J.1981) (applying New Jersey law); *Romaine, supra,* 109 *N.J.* at 290, 537 *A.*2d 284.

■ The listener's reasonable interpretation, which will be based in part on the context in which the statement appears, is the proper measure for whether the statement is actionable. *Restatement (Second) of Torts, supra,* § 566 comment c. If the comment occurred during an argument or is an outburst unrelated to the general topic of discussion, for example, a reasonable listener is less likely to accord to the challenged statement its literal meaning. Indeed, "[t]he ordinary reasonable recipient of a communication naturally discounts to some degree statements made in the heat of vitriolic battle, because the recipient understands and anticipates the human tendency to exaggerate positions during the

passions and prejudices of the moment." Smolla, *supra*, § 6.08[4][b][ii], at 6–35.

The *Restatement (Second) of Torts* effectively illustrates how circumstances may affect a recipient's interpretation of a communication:

> The circumstances under which verbal abuse is uttered affect the determination of how it is reasonably to be understood. Words uttered face to face during an altercation may well be understood merely as abuse or insult, while words written after time for thought or published in a newspaper may be taken to express the defamatory charge and to be intended to be taken seriously.

> [§ 566 comment e.]

### III

Most courts that have considered whether allegations of racism, ethnic hatred or bigotry are defamatory have concluded for a variety of reasons that they are not. The most important reason is the chilling effect such a holding would cast over a person's freedom of expression. In *Stevens v. Tillman*, 855 *F.*2d 394 (1988), *cert. denied*, 489 *U.S.* 1065, 109 *S.Ct.* 1339, 103 *L.Ed.*2d 809 (1989), the Seventh Circuit held that an accusation of bigotry is not actionable unless the statement suggests the existence of defamatory facts. An elementary-school principal sued the president of the local parent teacher association for calling the principal a "racist." Judge Easterbrook, writing for a unanimous panel, reasoned that

> [a]ccusations of "racism" no longer are "obviously and naturally harmful." The word has been watered down by overuse, becoming common coin in political discourse.... Formerly a "racist" was a believer in the superiority of one's own race, often a supporter of slavery or segregation, or a fomenter of hatred among the races.... Politicians sometimes use the term much more loosely, as referring to anyone (not of the speaker's race) who opposes the speaker's political goals—on the "rationale" that the speaker espouses only what is good for the jurisdiction (or the audience), and since one's opponents have no cause to oppose what is beneficial, their opposition must be based on race. The term used this way means only: "He is neither for me nor of our race; and I invite you to vote your race." ... That may be an unfortunate brand of politics, but it also drains the term of its former, decidedly opprobrious, meaning. The term has acquired intermediate meanings too. The speaker may use "she is a racist" to mean "she is condescending to me, which must be because of my race because there is no other reason to conde-

scend"—a reaction that attaches racial connotations to what may be an inflated opinion of one's self—or to mean "she thinks all black mothers are on welfare, which is stereotypical." Meanings of this sort fit comfortably within the immunity for name-calling.

[*Id.* at 402.]

Thus, the Seventh Circuit held that under Illinois law bald accusations of bigotry, unsupported by specific factual allegations, constitute mere personal invective, which is not actionable. *Ibid.; see also Buckley v. Littell,* 539 *F.*2d 882 (2d Cir.1976) (holding that the terms "fascist," "fellow traveler," and "radical right" directed against William F. Buckley, Jr., although strong and hate-filled, constituted expressions on matters of opinion, such as what constitutes a "fascist," and therefore did not necessarily imply defamatory facts), *cert. denied,* 429 *U.S.* 1062, 97 *S.Ct.* 785–86, 50 *L.Ed.*2d 777 (1977); *Rutherford v. Dougherty,* 91 *F.*2d 707 (3d Cir.1937) (holding that clergyman's accusation in letter to department store that operated radio station that radio broadcaster fomented religious hatred and bigotry was not libelous); *Sall v. Barber,* 782 *P.*2d 1216, 1218–19 (Colo.Ct.App.1989) (holding term "bigot," in context that plaintiff "was not fit to shine [another person's] shoes," and should be exiled with "other coyotes and skunks," would be perceived as "rhetorical hyperbole" and was not defamatory); *Rambo v. Cohen,* 587 *N.E.*2d 140, 147 (Ind.Ct.App.1992) (holding that statements that plaintiff was "anti-Semit[e]" and a "horse's butt" were not defamatory *per se,* because "obnoxious remarks, even remarks much more obnoxious than those Cohn is alleged to have made here, are not defamatory *per se,* and will not lead to liability without proof of special damages").

In *Raible v. Newsweek, Inc.,* 341 *F.Supp.* 804, 806–07 (W.D.Pa. 1972), the magazine placed plaintiff's picture next to an article that accuses the "white majority" of being "racially prejudiced," "angry, uncultured, crude," and "violence prone." Accepting that the article could be found to refer to the plaintiff, the court nevertheless concluded that the statements were not capable of a defamatory meaning, holding that "to call a person a bigot or other appropriate name descriptive of his political, racial, religious, economic or sociological philosophies gives no rise to an action for

libel." *Id.* at 807. The court noted our nation's long history of robust public expression, including the use of abusive rhetoric:

Americans have been hurling epithets at each other for generations. From charging "Copperhead" during the Civil War, we have come down to "Racist", "Pig", "Fascist", "Red", "Pinko", "Nigger Lover", "Uncle Tom" and such. Certainly such name calling, either expressed or implied, does not always give rise to an action for libel.

[*Id.* at 808–09.]

In *Rybas v. Wapner*, 311 *Pa.Super.* 50, 457 *A.*2d 108 (1983), a landlord sued a tenant and the tenant's attorney for libel because the tenant's attorney had written a letter to the landlord's attorney stating that the landlord should make some effort "to demonstrate that he is not as an [sic] anti-Semitic as he appears to be." *Id.*, 457 *A.*2d at 109. The court held that the statement, although personally offensive, was not actionable.

We note that to restrict too severely the right to express such opinions, no matter how annoying or disagreeable, would be [sic] dangerous curtailment of a First Amendment right. Individuals should be able to express their views about the prejudices of others without the chilling effect of a possible lawsuit in defamation resulting from their words.

[*Id.* at 110.]

In *Cibenko, supra*, 510 *F.Supp.* 761, a federal court interpreted New Jersey defamation law in a libel action brought by a white transit-police officer against the publisher of a sociology textbook. The textbook contained a photograph of the officer prodding a black man with a night-stick. The caption referred to the social status of the offender as the most significant determinant in applying criminal sanctions and questioned whether the officer would have acted the same way if the "offender" had been white. The court granted summary judgment in favor of the publisher because the allegedly libelous statement was not of or concerning the plaintiff when considered as a whole. *Id.* at 765. The court continued, however, that even if it considered the statement to be "of or concerning the plaintiff," no action would stand. The court reasoned as follows:

Even if innuendo implying that plaintiff is racially prejudiced were drawn [from the photograph and caption], it would be insufficient to constitute actionable libel

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

> [T]he innuendo ... is simply the author's commentary on undisputed facts. As such, it is editorial opinion, safeguarded by the First Amendment.
>
> [*Ibid.*]

Thus, the court determined that under federal constitutional law, that accusation of racism was non-actionable opinion. *Id.* at 766.

These cases demonstrate that most states do not consider words of bigotry or racism to constitute actionable defamation, thus protecting the freedom to express even unpopular, ugly and hateful, political, religious, and social opinions. *But see Sweeney v. Schenectady Union Pub. Co.,* 122 *F.*2d 288 (2d Cir.1941), (reversing dismissal of complaint involving newspaper article that falsely accused congressman of opposing the appointment of a certain person as a federal judge because that person was Jewish and holding that the statement could be actionable libel under a statute that made libelous *per se* the publication of "words which tend to expose one to public hatred, shame ... or [ ] induce an evil opinion of one in the minds of right-thinking persons"), *aff'd,* 316 *U.S.* 642, 62 *S.Ct.* 1031, 86 *L.Ed.* 1727, *reh'g denied,* 316 *U.S.* 710, 62 *S.Ct.* 1266, 86 *L.Ed.* 1776 (1942); *City of Brownsville v. Pena,* 716 *S.W.*2d 677 (Tex.Ct.App.1986) (upholding jury verdict finding libelous supervisor's comment in newspaper interview that plaintiff employee was "a person with racist attitudes against Mexicans legally residing in the United States" who had "threatened to fire them as soon as he takes over"). *Pena* and *Sweeney* are distinguishable from our case because the court in those cases deemed the statements libelous *per se* and the statements in those cases rested on specific facts. Interestingly, the Second Circuit's decision in *Sweeney* was the only one of eight published opinions that held the article to be defamatory. The other courts all ruled that the alleged statement was not actionable. *Ward, supra,* 263 *N.J.Super.* at 519 n. 4, 623 *A.*2d 285 (Skillman, J., dissenting).

## IV

■ Because this case implicates First Amendment freedoms, we must "'make an independent examination of the whole record,'" to ensure that "'"the judgment does not constitute a

forbidden intrusion on the field of free expression." ' " *Milkovich,* *supra,* 497 *U.S.* at 17, 110 *S.Ct.* at 2705, 111 *L.Ed.*2d at 17 (quoting *Bose Corp. v. Consumers Union, Inc.,* 466 *U.S.* 485, 499, 104 *S.Ct.* 1949, 1958, 80 *L.Ed.*2d 502, 515 (1984) (quoting *New York Times v. Sullivan,* 376 *U.S.* 254, 284–86, 84 *S.Ct.* 710, 728, 11 *L.Ed.*2d 686, 709 (1964))). We begin with Zelikovsky's characterization of Mrs. Ward as a "bitch." Although extremely offensive to Mrs. Ward and perhaps understood by those who heard it to express a negative opinion of her, defendant's description of Mrs. Ward as a "bitch" was "simply personal invective." *Ward, supra,* 263 *N.J.Super.* at 515, 623 *A.*2d 285 (Skillman, J., dissenting).

The term "bitch" is undoubtedly disparaging. But to hold that calling someone a "bitch" is actionable would require us to imbue the term with a meaning it does not have. Such a holding would, in effect, say that some objective facts exist to justify characterizing someone as a bitch. If calling someone a bitch is actionable, defendants must be able to raise the defense of truth. "Bitch" in its common everyday use is vulgar but non-actionable name-calling that is incapable of objective truth or falsity. A reasonable listener hearing the word "bitch" would interpret the term to indicate merely that the speaker disliked Mrs. Ward and is otherwise inarticulate. Although Zelikovsky's manner of expression was very offensive, our slander laws do not redress offensive ideas. Because the term "bitch" has no ascertainable content, is not verifiable and the context does not imbue the term with a fact intensive meaning, the trial court should have ruled the "bitch" statement non-actionable.

■■■■■■ Likewise, the trial court should have rejected the claim for slander based on the statement that the Wards "hate" or "don't like" Jews because that statement is also non-actionable. The Appellate Division found that defendant's statement did not fall within the four traditional categories of slander *per se,* and that plaintiffs had not proven special damages. 263 *N.J.Super.* at 510, 512, 623 *A.*2d 285. Nevertheless, the Appellate Division concluded that plaintiffs had an actionable claim by expanding the

scope of the categories of slander *per se* to include imputations of racial or ethnic bigotry such as occurred in this case. *Id.* at 512, 623 *A.*2d 285. We disagree with the Appellate Division's holding that defendant's "anti-Semitic" statement falls within slander *per se.*

A proper analysis of the alleged slanderous statement requires examination of the content of defendant's entire statement and the context in which it was made. Defendant's statement suggested no specific facts. As such, the statement cannot be distinguished from characterizations that a person is a "racist," "bigot," "Nazi," or "fascist." The statement claiming that the Wards are anti-Semitic could be slanderous only if reasonable listeners would interpret the statement to impute supporting facts. At trial, Zelikovsky claimed that his allegation of anti-Semitism was supported by the fact that his neighbor, Sheila Polin, had overheard Mr. Ward make an anti-Semitic statement. But that basis for the claim of anti-Semitism was not generally known to those who overheard Zelikovsky's statement, nor did Zelikovsky advise the listeners that this was the basis for his claim that the Wards "hate Jews." Thus, Zelikovsky made no factual statements and did not appear to rely on factual statements known to the audience that would transform his claim of anti-Semitism into an actionable statement.

The statement followed the classification of Mrs. Ward as a "bitch" and was part of an unsolicited emotional outburst. That context places the claim that the Wards "hate" or "don't like" Jews in the non-actionable category of name-calling that although hurtful to the target is not redressable under slander laws. Name-calling is not actionable under defamation law because "[a] certain amount of vulgar name-calling is tolerated, on the theory that it will necessarily be understood to amount to nothing more." Keeton, *supra*, § 111, at 776. As Judge Skillman's dissenting opinion observes,

> defendant was in a highly agitated state when he called Mrs. Ward a "bitch" and Mr. and Mrs. Ward "Jew haters." Under these circumstances, any reasonable

listener would have understood defendant's tirade to have been "merely giving vent to insult."

[263 *N.J.Super.* at 520, 623 *A*.2d 285 (quoting *Restatement (Second) of Torts, supra,* § 566 comment e).]

Defendant's statement was non-actionable and any claim based thereon should have been dismissed as a matter of law.

Not all accusations of bigotry are automatically non-defamatory, however. Instances may arise in which claiming someone is a bigot will become more than non-actionable insult. Whether an accusation of bigotry is actionable depends on whether the statement appeared to be supported by reasonably specific facts that are capable of objective proof of truth or falsity. The statement might explicitly refer to those specific facts or be made in such manner or under such circumstances as would fairly lead a reasonable listener to conclude that he or she had knowledge of specific facts supporting the conclusory accusation. For example, a claim of bigotry could include claims that the selected person had engaged in specific acts such as making racist statements, failing to associate with or to act with courtesy toward people of a particular race, denying another employment or advancement because of race or religion, or posting signs that carried a racist message. Even under those facts, a court would need to examine the context in which the statements were made before it determined that the statements could properly form the basis of a lawsuit for slander. And, of course, the court would have to find that plaintiffs had sustained special damages which we discuss in Section V.

## V

In addition, even if the statements had been found defamatory rather than merely insulting, plaintiffs would still have to prove special damages. Although scathing characterizations can be hurtful, the law of defamation does not provide redress whenever feelings and sensibilities are offended. Harper, *supra,* 2 *The Law of Torts* § 5.1, at 24. Rather, recovery for slander exists to redress solely harm to reputation. *See Printing Mart–Morris-*

*town v. Sharp Elecs. Corp.*, 116 *N.J.* 739, 765, 563 *A.*2d 31 (1989) (stating, "Defamation imposes liability for publication of false statements that injure the reputation of another.").

To succeed in an action for slander, the plaintiff must demonstrate actual harm to reputation through the production of concrete proof. *See Sisler, supra,* 104 *N.J.* at 261, 516 *A.*2d 1083 (1986) (describing identical requirement of proving injury to reputation in libel cases). "Awards based on a plaintiff's testimony alone or on 'inferred' damages are unacceptable." *Id.* at 281, 516 *A.*2d 1083. Rather, proof that an existing relationship has been seriously disrupted or testimony of third parties detailing a diminished reputation will be necessary to satisfy the requirement that special damages exist before a jury may award any other type of damages. *Ibid.* Special damages are defined as harm of a material or pecuniary nature. *Arturi v. Tiebie,* 73 *N.J.Super.* 217, 222, 179 *A.*2d 539 (App.Div.1962).

The damages element is waived under the four traditional categories of slander *per se* because damage to reputation is presumed to flow from such statements. *Gnapinsky, supra,* 23 *N.J.* at 250, 128 *A.*2d 697; Keeton, *supra,* § 112, at 788. The "anti-Semitic" statement does not come within any of the four traditional categories of slander *per se.* We do not adopt the Appellate Division's holding that expanded the four slander *per se* categories to include allegations of bigotry, and we caution against further expansion of the highly-criticized *per se* categories.

The slander *per se* categories exist because historically, some types of statements were held to " 'clearly "sound to the disreputation" of the plaintiff,' " making them "defamatory on their face and actionable *per se.*" *Hall v. Heavey,* 195 *N.J.Super.* 590, 595, 481 *A.*2d 294 (App.Div.1984) (quoting *Shaw v. Bender,* 90 *N.J.L.* 147, 149, 100 *A.* 196 (E. & A.1917) (quoting *Odg. L. & S.* *18)). Because courts assumed such statements were injurious, the court would " 'presume without proof, that plaintiff's reputation has been thereby impaired.' " *Ibid.* (quoting *Shaw, supra,* 90 *N.J.L.* at 149, 100 *A.* 196).

■ Commentators discourage the continued existence of slander *per se* categories and specifically disagree with the rule that parties need prove no special damages for those types of slander. *E.g.*, David A. Anderson, *Reputation, Compensation, and Proof,* 25 *Wm. & Mary L.Rev.* 747, 748 (1984) (hereinafter "Anderson"). Requiring proof of special damages requires a plaintiff to demonstrate harm to reputation from an alleged defamatory statement. *See Arturi, supra,* 73 *N.J.Super.* at 223, 179 *A.*2d 539 (observing that direct harm, i.e., emotional distress caused by plaintiff's knowledge that he was defamed, is not special harm because only harm to reputation is compensable). The trend of modern tort law is to focus on the injury not the wrong and the slander *per se* categories are a relic from tort law's previous age. Anderson, *supra,* 25 *Wm. & Mary L.Rev.* at 747–48. Because the goal of defamation law should be to "compensat[e] individuals for harm to reputation," the trend should be toward elimination not expansion of the *per se* categories. Harper, *supra,* 2 *The Law of Torts* § 5.14, at 116; Keeton, *supra,* § 112, at 794; Smolla, *supra,* § 7.09, at 7–16; Anderson, *supra,* 25 *Wm. & Mary L.Rev.* at 749, 751.

We leave for another time whether we should eliminate slander *per se.* Today we decide only that we will not expand the four slander *per se* categories and that defendant's "anti-Semitic" statement does not come within any of the four traditional categories of slander *per se.*

■ Because we reject the Appellate Division's determination that allegations of bigotry qualify as slander *per se,* the law requires specific proof that plaintiffs suffered special damages as a prerequisite to any recovery. Special damages are defined as "the loss of something having economic or pecuniary value." *Restatement (Second) of Torts, supra,* § 575 comment b; *See* Anderson, *supra,* 25 *Wm. & Mary L.Rev.* at 760 (advocating substitution of term "actual injury" for "special damages"). The Wards' proofs in this case were inadequate to meet the causation and damages elements necessary to a successful tort action. Both the majority

and dissent in the Appellate Division found that plaintiffs' claimed loss did not constitute "harm of a material or pecuniary nature". *Ward, supra,* 263 *N.J.Super.* at 503, 526, 623 *A.*2d 285. The Wards did not offer sufficient proof that the "chill" they felt, the feeling of not being wanted at condominium affairs, and the alleged decline in Mrs. Ward's real-estate business actually existed and were caused by Zelikovsky's statement at the condominium board meeting. Significantly, no witness testified to thinking less of the Wards because of Zelikovsky's statements. *See* Anderson, *supra,* 25 *Wm. & Mary L.Rev.* at 770 n. 94 (noting that "a defamation plaintiff always must choose whether to suffer in silence or risk further harm to his reputation" by being forced to repeat defamation when seeking witnesses to testify about their perception of plaintiffs after statement). Indeed, the witness presented by the Wards testified that the Wards did not drop in their esteem as a result of Zelikovsky's statements. Moreover, "lowered social standing and its purely social consequences are not sufficient" to support a finding of special damages. *Restatement (Second) of Torts, supra,* § 575 comment b. Even the jury did not find special damages on its first review of the case. *Ward, supra,* 263 *N.J.Super.* at 526, 623 *A.*2d 285.

 Because special damages are a prerequisite to recovery in a slander action, the punitive damage awards were also improper. Accordingly we do not reach the questions posed in defendant's petition for certification of whether adequate evidence was presented to justify the punitive damage awards.

## VI

We sympathize with the Wards. Defendant's language was extremely repulsive and hateful and undoubtedly caused the Wards great embarrassment. It was not, however, defamatory, nor did the Wards prove that the statements caused ascertainable damage to their reputation. There is a regrettable rudeness in our society today. Social and public discourse is marked by uncivility and boorishness. Nonetheless, as society has evolved,

social attitudes toward judicial review of speech have changed. As a society we have made a determination that the best way to combat bias and prejudice is through the exchange of ideas and speech, not through lawsuits.

We continue to seek a balance between freedom of speech and protection of a person's reputation. In recognizing that important balance, we determine that the content of defendant's hateful statement, the context in which he said it, its lack of verifiability, and the lack of any special damages establish that Zelikovsky's conduct, although hateful and despicable, was not actionable under the law of slander.

We reverse the judgment of the Appellate Division and remand to the Law Division for entry there of an Order dismissing plaintiffs' claims for failing to state a cause of action on which relief may be granted. No costs.

STEIN, J., concurring.

I concur in the Court's judgment, but only because I agree with the holding that allegations of bigotry do not constitute slander *per se, ante* at 541–42, 643 *A*.2d at 984–85, and with the Court's determination that plaintiffs' evidence was insufficient to satisfy the requirement of proof of special damages. *Ante* at 542, 643 *A*.2d at 985. I cannot agree, however, with the Court's conclusion that plaintiffs' proofs did not establish a cause of action for defamation. *Ante* at 538–40, 643 *A*.2d at 983–84.

No one could find fault with the Court's observation that "the best way to combat bias and prejudice is through the exchange of ideas and speech, not through lawsuits." *Ante* at 543, 643 *A*.2d at 985. But the critical issue presented by this appeal is not whether litigation is the ideal vehicle to combat prejudice, but rather whether plaintiffs presented sufficient evidence of defamation to warrant submission of the issue to the jury. The Court's explanation of the applicable legal principles is virtually flawless, but in my view it errs grievously in applying the law to the facts.

The Court acknowledges that content and context determine whether an accusation of bigotry is defamatory:

Whether an accusation of bigotry is actionable depends on whether the statement appeared to be supported by reasonably specific facts that are capable of objective proof of truth or falsity. The statement might explicitly refer to those specific facts or be made in such manner or under such circumstances as would fairly lead a reasonable listener to conclude that he or she had knowledge of specific facts supporting the conclusory accusation.

[*Ante* at 539, 643 *A*.2d at 983.]

In that respect, the Court's observations track the analysis in the Restatement of Torts on which the Court relies:

The second kind of expression of opinion, or the mixed type, is one which, while an opinion in form or context, is apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant or assumed to exist by the parties to the communication. Here the expression of the opinion gives rise to the inference that there are undisclosed facts that justify the forming of the opinion expressed by the defendant. To say of a person that he is a thief without explaining why, may, depending upon the circumstances, be found to imply the assertion that he has committed acts that come within the common connotation of thievery.

[*Restatement (Second) of Torts* § 566 comment b (1977).]

The United States Supreme Court recently expressed similar views in assessing the potentially defamatory nature of expressions of opinion:

[E]xpressions of "opinion" may often imply an assertion of objective fact.

If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

[*Milkovich v. Lorain Journal Co.*, 497 *U.S.* 1, 18–19, 110 *S.Ct.* 2695, 2705–06, 111 *L.Ed.*2d 1, 17–18 (1990).]

The record informs us that Zelikovsky was the "principal financier" for the slate of directors elected to the board of the Ocean Club condominium association in 1988, a fact that suggests that he was a reasonably influential figure in the association. Apparently, a substantial portion of the association's membership was Jewish. Zelikovsky's statements were made at a meeting of the association

attended by approximately one hundred residents. While Mrs. Ward was speaking about an unrelated matter, Zelikovsky stood up and shouted the offending words. Depending on whether Mrs. Ward's or Mr. Ward's testimony concerning the event is more accurate, Zelikovsky either said "Don't listen to these people. They don't like Jews. She's a bitch. I remember her. She's a bitch," or he said "I know her. She's a bitch. These people, they hate Jews. These people hate Jews."

The Court goes astray when it concludes that Zelikovsky's allegations could not be defamatory because "Zelikovsky made no factual statements and did not appear to rely on factual statements known to the audience that would transform his claim of anti-Semitism into an actionable statement." *Ante* at 538, 643 *A.*2d at 983. As the *Restatement* makes clear, "[T]he expression of the opinion gives rise to the inference that there are undisclosed facts that justify the forming of the opinion expressed by the defendant." *Restatement (Second) of Torts, supra,* § 566 comment b. Assuming, as the record suggests, that Zelikovsky was a respected member of the association, the audience was extremely likely to infer that his characterization of the Wards as "Jew haters" was supported by facts, especially when accompanied by the declarations "I know these people" or "I know her." Those statements imply that Zelikovsky possessed specific information supporting that allegation, the truth or falsity of which would have been verifiable at trial. Although the Court acknowledges that "only if Zelikovsky's statement suggested specific factual assertions that could be proven true or false could the statement qualify as actionable defamation," *ante* at 531, 643 *A.*2d at 979, the Court appears to be disinclined to recognize that Zelikovsky's characterization of the Wards strongly implied the existence of underlying facts. If the condominium-association members understood Zelikovsky's statements to be based on undisclosed facts, their defamatory potential was devastating.

In concluding that Zelikovsky's statements fall into "the nonactionable category of name-calling * * * not redressable under

slander laws," *ante* at 538, 643 *A.*2d at 983, the Court usurps the jury's function. The *Restatement* correctly allocates the responsibility of the court and the jury: a court's duty is "to determine whether an expression of opinion is *capable of bearing a defamatory meaning* because it may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion," and the jury's function is "to determine whether that meaning was attributed to it by the recipient of the communication." *Restatement (Second) of Torts, supra,* § 566 comment c (emphasis added).

Because Zelikovsky's statements were "capable of bearing a defamatory meaning," the Court errs in concluding as a matter of law that the issue should not have been submitted to the jury.

For the reasons stated, I concur in the judgment.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*Concurring in result*—Justice STEIN.